*Natella Azizova v. Muzaffar Suleymanov*, No. 2338, September Term, 2018.  Opinion by Battaglia, J.

**CHILD CUSTODY – BEST INTEREST OF THE CHILD – GENDER BIAS IN JUDICIAL DECISION MAKING**

The trial judge abused her discretion in awarding father primary physical custody of child based upon the finding that the mother was unfit to parent, a finding predicated on the trial judge's stereotypes about the fragility of infancy and the mother's inability to function in the best interest of the child, because of the mother's youth, her part-time work and enrollment in school, as well as an incident of drunkenness in which the father was involved, but the child was not present.

Circuit Court for Washington County
Case No.: 21-C-17-058844

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2338

September Term, 2018

_____

NATELLA AZIZOVA

v.

MUZAFFAR SULEYMANOV

_____

Leahy,
Wells,
Battaglia, Lynne, A.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Battaglia, J.

_____

Filed:  November 21, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This appeal stems from an order of a trial judge sitting in the Circuit Court for Washington County, who awarded appellee, Muzaffar Suleymanov, primary physical custody of the child he fathered with appellant, Natella Azizova, who asks us to reverse this determination.[1]

For the reasons that follow, we shall hold that the trial judge abused her discretion in awarding Mr. Suleymanov primary physical custody of the child and shall vacate and remand the matter for a new hearing.

---

[1] Appellant, Natella Azizova, presents us with the following seven questions:

1. Whether the Circuit Court abused its discretion in awarding primary physical custody to Appellee.

2. Whether the Circuit Court's findings were clearly erroneous and unsupported by the evidence.

3. Whether the Circuit Court abused its discretion in ordering the minor returned to Hagerstown.

4. Whether the Circuit Court erred in basing its decision on stale, dated, and irrelevant evidence.

5. Whether the Circuit Court abused its discretion in making provisions regarding long-term custody of the child and restricting Appellant's visitation commencing 2021.

6. Whether the Circuit Court erred in failing to make provisions for regular contact between Appellant and the minor when in the custody of Appellee (and, indeed, vice versa as well).

7. Whether the findings made and the judgment and final custody order entered by the Circuit Court were erroneous, clearly erroneous, and an abuse of discretion, and contrary to law.

# LAW

It is well established that custody determinations are to be made by a careful examination of the specific facts of each individual case; the "fact finder is called upon to evaluate the child's life chances in each of the homes competing for custody and then to predict with whom the child will be better off in the future." *Montgomery Cnty. v. Sanders*, 38 Md. App. 406, 419 (1977). Courts possess wide discretion in determining questions concerning the welfare of children, the authority of which "clearly empowers courts applying the best interests standard to consider any evidence which bears on a child's physical or emotional well-being." *Bienenfeld v. Bennett-White*, 91 Md. App. 488, 503–04, *cert. denied*, 327 Md. 625 (1992). Although courts are not limited to a list of factors in applying the best interest standard in each individual case, the cases of the Court of Appeals and of this Court, beginning with *Montgomery County Department of Social Services v. Sanders*, 38 Md. App. 406 (1977) and *Taylor v. Taylor*, 306 Md. 290 (1986), have set forth a non-exhaustive delineation of factors that a court must consider when making custody determinations, which have been consolidated in *Fader's Maryland Family Law*, a veritable compendium of domestic relations law:

> (1) The fitness of the parents;
> (2) The character and reputation of the parties;
> (3) The requests of each parent and the sincerity of the requests;
> (4) Any agreements between the parties;
> (5) Willingness of the parents to share custody;
> (6) Each parent's ability to maintain the child's relationships with the other parent, siblings, relatives, and any other person who may psychologically affect the child's best interest;
> (7) The age and number of children each parent has in the household;
> (8) The preference of the child, when the child is of sufficient age and capacity to form a rational judgment;

(9) The capacity of the parents to communicate and to reach shared decisions affecting the child's welfare;
(10) The geographic proximity of the parents' residences and opportunities for time with each parent;
(11) The ability of each parent to maintain a stable and appropriate home for the child;
(12) Financial status of the parents;
(13) The demands of parental employment and opportunities for time with the child;
(14) The age, health, and sex of the child;
(15) The relationship established between the child and each parent;
(16) The length of the separation of the parents;
(17) Whether there was a prior voluntary abandonment or surrender of custody of the child;
(18) The potential disruption of the child's social and school life;
(19) Any impact on state or federal assistance;
(20) The benefit a parent may receive from an award of joint physical custody, and how that will enable the parent to bestow more benefit upon the child;
(21) Any other consideration the court determines is relevant to the best interest of the child.

Cynthia Callahan & Thomas C. Ries, Fader's Maryland Family Law § 5-3(a), at 5-9 to 5-11 (6th ed. 2016) (footnotes omitted). *Fader's Maryland Family Law* also delineates other factors that courts are encouraged to consider in custody determinations:

(1) the ability of each of the parties to meet the child's developmental needs, including ensuring physical safety; supporting emotional security and positive self-image; promoting interpersonal skills; and promoting intellectual and cognitive growth;
(2) the ability of each party to meet the child's needs regarding, *inter alia*, education, socialization, culture and religion, and mental and physical health;
(3) the ability of each party to consider and act on the needs of the child, as opposed to the needs or desires of the party, and protect the child from the adverse effects of any conflict between the parties;
(4) the history of any efforts by one or the other parent to alienate or interfere with the child's relationship with the other parent;
(5) any evidence of exposure of the child to domestic violence and by whom;
(6) the parental responsibilities and the particular parenting tasks customarily performed by each party, including tasks and responsibilities performed before the initiation of litigation, tasks and responsibilities performed during

3

the pending litigation, tasks and responsibilities performed after the issuance of orders of court, and the extent to which the tasks have or will be undertaken by third parties;

(7) the ability of each party to co-parent the child without disruption to the child's social and school life;

(8) the extent to which either party has initiated or engaged in frivolous or vexatious litigation, as defined in the Maryland Rules; and

(9) the child's possible susceptibility to manipulation by a party or by others in terms of preferences stated by the child.

*Id.* at § 5-3(b), at 5-11 to 5-12 (footnote omitted).

## *Judicial Bias*

Unequivocally, the test with respect to custody determinations begins and ends with what is in the best interest of the child. *Boswell v. Boswell*, 352 Md. 204, 236 (1998). In between, a trial judge must determine whether a particular issue related to a parent presents harm to the health and welfare of a child or affects the child's development, and whether there is a nexus between the parental issue and any adverse impact on the child's overall well-being. *Id.* at 235–38; *see also Whaley v. Whaley*, 399 N.E.2d 1270 (Ohio Ct. App. 1978).

The Court of Appeals and this Court have time and time again affirmed custody determinations where the trial judge embarked upon a thorough, thoughtful and well-reasoned analysis congruent with the various custody factors. *See Santo v. Santo*, 448 Md. 620, 646 (2016) (The decision of the circuit court was "predicated on its thorough review of the *Taylor* factors, deliberation over custody award options, sober appreciation of the difficulties before it, and use of strict rules including tie-breaking provisions to account for the parties' inability to communicate" and "was rational and guided by established principles of Maryland law. No abuse of discretion occurred in this case."); *Reichert v.*

4

*Hornbeck*, 210 Md. App. 282, 308 (2013) ("[T]he court 'articulated fully the reasons that support[ed the] conclusion' that joint physical and legal custody was appropriate through an extensive and thoughtful consideration of all suggested factors."); *Hughes v. Hughes*, 80 Md. App. 216, 234 n.5 (1989) (stating that the trial judge's decision to deny father's request for joint custody consisted of "thorough and well reasoned analysis").

In situations, however, where a trial judge, while assessing a particular factor, has been guided by their personal beliefs in fashioning an outcome rather than by the evidence, we and our colleagues on the Court of Appeals have vacated that decision.

In 1998, the Court of Appeals, in *Boswell v. Boswell*, 352 Md. 204 (1998), for example, reaffirmed the notion that a trial judge, applying the best interest standard to a visitation determination, must not let their personal beliefs or biases pertaining to a parent's lifestyle choice interfere in custodial decision-making, but rather, should only consider how such a choice adversely impacts the best interest of a child. In *Boswell*, the trial judge, without request from either party, placed limitations on the children's visitation with their father based upon his cohabitating with a same-sex partner, reasoning:

> [W]here there is a . . . paramour involved. . . . I have often, time and time again, restricted visitation. I think that's only appropriate. *** [I will hold] down the . . . visitations of both the weekend and Wednesday and [restrict] during this period any overnight visitation. Clearly the Court is convinced that . . . there is a relationship, at least up until this time, and no concern to change before this time, that [the father] is sleeping with . . . another person without the cloak of a marital relationship.
>
> ***
>
> [T]here will be no visitation in the home where there is . . . [the father's partner]. Or any other situation that goes to a relationship that isn't condoned.

5

*Id.* at 212 (emphasis removed) (alterations in original). In addressing the father, the trial judge continued:

> [T]here may come a time when you would elect to have someone else stay at the home with you, perhaps a female companion or another male companion, but my order is that the children are not to visit you under those circumstances. So if it means taking them to some other place, some neutral place, then that's the Order of this Court, and that's a strict order [until] it is clear to me that we'll have no situation where you have a live-in companion.

*Id.* (emphasis removed). The visitation order entered by the trial judge prohibited any overnight visitation and visitation with the children in the presence of "anyone having homosexual tendencies or such persuasions, male or female, or with anyone that the father may be living with in a non-marital relationship." *Id.* at 211. We, thereafter, vacated the decision of the circuit court based upon the judge's failure to make any factual findings to support its assumption that the children would be harmed by visiting their father "in the company of homosexuals." *Boswell v. Boswell*, 118 Md. App. 1, 34 (1997), *aff'd*, 352 Md. 204 (1998).

The Court of Appeals affirmed our decision and expressed its disapproval of the fact that the trial court had "acted on its own initiative, seemingly influenced by its own biases and belief that" the father's non-marital relationship with his same-sex partner was "'inappropriate.'" *Boswell*, 352 Md. at 238. The Court explained its reasoning:

> In all family law disputes involving children, the best interests of the child standard is always the starting—and ending—point. We see no reason to deviate from this standard here. When we narrow the focus to proceedings involving proposed visitation restrictions in the presence of non-marital partners, courts also are to examine whether the child's health and welfare is being harmed. Once a finding of adverse impact on the child is made, the trial court must then find a nexus between the child's emotional and/or physical harm and the contact with the non-marital partner. If no clear, direct

connection is found, then the non-custodial parent's visitation rights cannot be restricted.

We want to emphasize that the above formulation does not require a court to sit idly by and wait until a child is actually harmed by liberal unrestricted visitation. If there is sound evidence demonstrating that a child is likely to be harmed down the road, but there is no present concrete finding of harm, a court may still consider a child's future best interests and restrict visitation. The need for a factual finding of harm to the child requires that the court focus on evidence-based factors and not on stereotypical presumptions of future harm.

Therefore, before a trial court restricts the non-custodial parent's visitation, it must make specific factual findings based on sound evidence in the record. If the trial court does not make these factual findings, instead basing its ruling on personal bias or stereotypical beliefs, then such findings may be clearly erroneous and the order may be reversed. In addition, if a trial court relies on abstract presumptions, rather than sound principles of law, an abuse of discretion may be found.

*Id.* at 236–37. *See also North v. North*, 102 Md. App. 1 (1994) (holding that trial court abused its discretion in restricting HIV-positive, homosexual parent's visitation rights to weekend daylight hours to prevent him from exposing children to his lifestyle); *Bienenfeld*, 91 Md. App. at 508 (holding that a court in a custody proceeding may only consider evidence of religious views or practices of the party seeking custody to the extent that such view or practices bear upon the physical or emotional welfare of the child). *But see Levitsky v. Levitsky*, 231 Md. 388, 400 (1963) (remanding decision of circuit court granting mother custody of children, concluding that her religious views might bar her from having custody of the children where, based upon her religious beliefs, she refused to permit her son to have blood transfusions which medical professionals deemed essential to save his life).

7

Other state courts also have recognized that a judge's personal beliefs or biases have no place in a custody decision, absent a showing that the lifestyle choice of a parent had, or will have, an adverse impact on the child's interests. The intermediate appellate court of Ohio, in *Whaley v. Whaley*, 399 N.E.2d 1270 (Ohio Ct. App. 1978), held that a change in custody from the mother to the father was improper, where it was ordered to punish the mother for conduct the court considered morally wrong, including her relationship with a married man who was separated from his wife, despite the fact that the record was devoid of any showing of the need for such a change. The court explained:

> The judge's decision demonstrates that the change in custody was ordered to punish Mrs. Whaley for conduct the court considered morally wrong.
>
> This is not the standard in the State of Ohio. The state is concerned with the child's welfare. A child must not be used to punish or reward conduct a particular judge might condemn or condone.
>
> ***
>
> The [standard] that immoral conduct must be shown to have a direct or probable adverse impact on the welfare of the child in order to justify a change of custody, we believe to be the rule in Ohio. . . . While a court should not inquire into competing moral value systems, it can recognize that such moral standards do exist, and that children are harmed by being raised in immoral surroundings. [Under a direct adverse impact] standard the court looks not to moral systems, but to the interests of the child. A court need not classify certain conduct as a "wicked sin" or "mere indiscretion"; rather, it looks only to the effect, if any, the conduct has on the child.

*Id.* at 1273–75 (citations omitted).

The Ohio Court of Appeals also, in *Rowe v. Franklin*, 663 N.E.2d 955, 956–57 (Ohio Ct. App.), *cert. denied*, 74 Ohio St.3d 1464 (1995), utilizing a standard requiring a nexus between the conduct of a parent and a deleterious effect on the child, abrogated a

8

trial court's judgment which awarded the father physical custody of a child, a determination that the child's mother sought to reverse. In *Rowe*, the mother sought to permanently relocate her son from Ohio to Kentucky, where the two had temporarily resided, based upon her position as a part-time pilot with the United States Army. *Id.* at 956. While in Kentucky, the mother had developed a relationship with a man who was married but separated from his wife, whereupon she became pregnant, thereafter electing to enroll in law school. *Id.* In making his factual findings pursuant to the custody factors relevant in Ohio, similar to those in Maryland, the trial judge had expressed concern over the mother's relationship with "her male companion and the lifestyle choices" she made concerning her career. *Id.* at 957. The appellate court reversed, stating that:

> From our review of the record, the trial court's findings of fact and conclusions of law reflect that it abused its discretion . . . because we are convinced that the trial court did not consider in its analysis of the child's best interests whether the mother's conduct had a direct adverse impact on the child when it transferred custody and designated the father as custodial parent. We find significant the trial court's apparent judgmental attitude toward the mother's life choices.

*Id.* at 958. The Court further explained that an evaluation of a child's best interests does not include a critique of a parent's lifestyle choices insofar as it does not impact the well-being of the child:

> Concern for a child's well-being or best interests does not, however, provide the court *carte blanche* to judge the rights and lifestyles of parents by nonstatutory codes of moral or social values. Although a court is not obligated to wear blinders as to a parent's lifestyle and/or morals, including sexual conduct, any state interest in competing lifestyles and accompanying moral values which affect child custody would most equitably be served if limited to a determination of the direct or probable effect of parental conduct on the physical, mental, emotional, and social development of the child, as opposed to a determination of which lifestyle choices made by a parent are

9

"correct." In a society as diverse as the one in which we live a court is ill-equipped to determine which of such choices are "correct."

*Id.* at 956–57 (citing *Whaley*, 399 N.E.2d at 1275). *See also Marko v. Marko*, 816 N.W.2d 820, 829 (S.D. 2012) (stating that "[w]hen a court finds that a parent's lifestyle directly and adversely impacts the children, that parent's behaviors become relevant to the court's custody determination.").

The California Supreme Court, in *Burchard v. Garay*, 724 P.2d 486, 539–40 (Cal. 1986), addressed the impact of a woman working on the care of a child who was nearly three-years old and held that it was an abuse of discretion for a trial court to award the father custody based upon an unsupported assumption that a working mother could not provide adequate care, especially when the mother had been the "primary caregiver."[2] The

---

[2] Interestingly, in a 2018 article, Andrea L. Miller, of the Department of Psychology, University of Illinois at Urbana-Champaign, discussed her findings from a study regarding whether the "substantial subject-matter and decision-making expertise" that judges possess insulated them from being "influenced by their ideas about traditional gender roles to the same extent as laypeople." Andrea L. Miller, *Expertise Fails to Attenuate Gendered Biases in Judicial Decision-Making*, 10(2) SOC. PSYCHOL. & PERSONALITY SCI. 227 (2019). The results of her study supported the hypothesis "that judges' decision-making was substantially influenced by gender ideology." *Id.* at 232. She found that "[j]udges' support for traditional gender roles for men and women predicted gender disparities in both a child custody case and an employment discrimination case" and that decision-making expertise of judges "does not buffer them against the biasing influence of gender ideology." *Id.* Dr. Miller also posited that the results, "also raise the possibility that expertise may open the door for greater bias in some cases[,]" *id.*, which may include the perception "that women who work are bad mothers[,]" *id.* at 227. *See also* Richard A. Warshak, *Gender Bias in Child Custody Decisions*, 34 FAM. & COUNCIL. CTS. REV. 396, 398 (1996) ("Mothers who pursue a career are punished for shirking their maternal responsibilities, whereas fathers are rewarded for providing slightly more than minimal assistance in child rearing."); Susan Beth Jacobs, Note and Comment, *The Hidden Gender Bias Behind "The Best Interest of the Child" Standard in Custody Decisions*, 13 GA. ST. U. L. REV. 845 (1997) ("Instead of safeguarding the psychological and physical welfare of the child, hidden gender bias can result in a custody decision that is not in the best interest of the child.").

bases for the lower court's award to the father rested on his better financial position and the fact that he did not have to employ babysitters because he was married, according to the opinion of the appellate court:

> Applying the "best interests" test, [the trial court] awarded custody to [the father]. Its decision appears to be based upon three considerations. The first is that [the father] is financially better off—he has greater job stability, owns his own home, and is "better equipped economically . . . to give constant care to the minor child and cope with his continuing needs." The second is that [the father] has remarried, and he "and the stepmother can provide constant care for the minor child and keep him on a regular schedule without resorting to other caretakers"; [the mother], on the other hand, must rely upon babysitters and day care centers while she works and studies [to become a registered nurse]. Finally, the court referred to [the father] providing the mother with visitation, an indirect reference to [the mother's] unwillingness to permit [the father] visitation.

*Id.* at 487–88. The Court, although finding that the standard for custody had been articulated as the best interest of the child, concluded that the application of that standard had been skewed:

> The court's reliance upon the relative economic position of the parties is impermissible; the purpose of child support awards is to ensure that the spouse otherwise best fit for custody receives adequate funds for the support of the child. Its reliance upon the asserted superiority of [the father's] child care arrangement suggests an insensitivity to the role of working parents. And all of the factors cited by the trial court together weigh less to our mind than a matter it did not discuss—the importance of continuity and stability in custody arrangements. We therefore reverse the order of the trial court.

*Id.* at 488. The Court further explained how the trial court had abused its discretion in awarding the father physical custody of the three-year old child because the lower court had failed to assess the relationship between mother and child, but merely relied on an "assumption" that a working woman cannot care for her child:

The trial court's decision referred to [the father's] better economic position, and to matters such as home ownership and ability to provide a more "wholesome environment" which reflect economic advantage. But comparative income or economic advantage is not a permissible basis for a custody award. "[T]here is no basis for assuming a correlation between wealth and good parenting or wealth and happiness." If in fact the custodial parent's income is insufficient to provide a proper care for the child, the remedy is to award child support, not to take away custody.

The court also referred to the fact that [the mother] worked and had to place the child in day care, while [the father's] new wife could care for the child in their home. But in an era when over 50 percent of mothers and almost 80 percent of divorced mothers work, the courts must not presume that a working mother is a less satisfactory parent or less fully committed to the care of her child. A custody determination must be based upon a true assessment of the emotional bonds between parent and child, upon an inquiry into "the heart of the parent-child relationship . . . the ethical, emotional, and intellectual guidance the parent gives the child throughout his formative years, and often beyond." It must reflect also a factual determination of how best to provide continuity of attention, nurturing, and care. It cannot be based on an assumption, unsupported by scientific evidence, that a working mother cannot provide such care—an assumption particularly unfair when, as here, the mother has in fact been the primary caregiver.

\*\*\*

The essence of the court's decision is simply that care by a mother who, because of work and study, must entrust the child to daycare centers and babysitters, is per se inferior to care by a father who also works, but can leave the child with a stepmother at home. For the reasons we have explained, this reasoning is not a suitable basis for a custody order.

*Id.* at 491–92 (citations and footnotes omitted). The Court also took issue with the trial court's finding that the father was "better equipped psychologically" to care for the child, based upon the mother's past emotional problems, because the court failed also to consider the father's conduct which had not served as "a model of emotional maturity." *Id.* at 492.

The Court, finally, concluded that, "[a]ll of these grounds, however, are insignificant compared to the fact that" the mother "has been the primary caretaker for the

child from birth to the date of the trial court hearing, that no serious deficiency in her care has been proven, and that [the child], under her care, has become a happy, healthy, well-adjusted child." *Id.* at 492–93 (footnote omitted). It made "clear that in deciding the issue of custody the court cannot base its decision upon the relative economic position of the parties or upon any assumption that the care afforded a child by single, working parents is inferior." *Id.* at 493; *see also Dempsey v. Dempsey*, 292 N.W.2d 549, 554 (Mich. Ct. App. 1980) (reversing custody decision of trial court where it awarded custody of three children to the father because he had a full-time job and could maintain a family home, even though he had spent little time with his family and planned to have a neighbor, a sister-in-law, and three other women provide child care in his absence).

*Past Conduct of a Parent*

Furthermore, when evaluating what is in the best interest of a child, the determinative factor "is what appears to be in the welfare of the children <u>at</u> <u>the</u> <u>time</u> of the [custody] hearing." *Raible v. Raible*, 242 Md. 586, 594 (1966) (emphasis added). An evaluation of a parent's past conduct is only relevant insofar as it is predictive of future behavior and its effect on the child. *Id.* (holding it was not in the best interest of the children to terminate physical custody of mother who had been involved romantically with a married man, after her divorce, and had ceased the conduct at issue well before the custody hearing). In *Boswell*, *supra*, 352 Md. at 237, the Court of Appeals also stated that any potential harm stemming from a parent's lifestyle choice does not necessarily have to be present at the time of a visitation, or custody, determination in order to be considered in the best interest calculus; rather, a court may consider a child's future best interests, but

13

must make factual findings of harm to the child that requires the court to focus on evidence-based factors. Generally, past conduct is raised in custody or termination of parental rights cases where neglect or abuse has been alleged and the previously abusive or neglectful parent has the burden of proving that the past conduct will not likely be repeated. *In re Adoption of Cadence B.*, 417 Md. 146, 158 (2010); *see also In re Yve S.*, 373 Md. 551, 587 (2003).

## FACTUAL BACKGROUND

In the present case, Muzaffar Suleymanov of Hagerstown, Maryland, on January 4, 2017, filed a petition for custody of nine-month old child, A.,[3] that he had fathered with Natella Azizova, then of Alpharetta, Georgia. On January 23, 2017, Mother filed a counter-complaint for custody, requesting that she be awarded sole legal and physical custody of A. and that any access awarded to Father with the child be supervised.

On May 7, 2017, a Family Magistrate of the Circuit Court for Washington County heard the matter, and, thereafter, issued Proposed Findings and Recommendations, which recommended that mother should be granted sole legal custody and primary physical custody of A., while providing Father with monthly week-long visitation rights. In so recommending, after hearing testimony from the parties and their respective witnesses, the magistrate made the following findings based upon his credibility determinations:

> Plaintiff, Muzaffar Suleymanov, and Defendant, Natella Azizova, are the parents of a young child [A.], born [in March of 2016]. The parties lived together until late December 2016. On or about December 27, 2016, the

---

[3] Because the child is a minor, we refer to her by the initial of her first name.

Defendant, along with the minor child, left for Georgia[4] for an approximate eight (8) day vacation with Defendant's family. Since traveling to Georgia, Defendant and [A. have] remained living with her family [in Georgia]. Mr. Suleymanov remains living at his mother's home [in Hagerstown, Maryland], the home in which the parties resided until late December. Mr. Suleymanov has not had contact with the child since late December.

Plaintiff and Defendant lived with Plaintiff's mother in [Hagerstown]. The parties testified that they are married, but not married in a state sanctioned ceremony. Mr. Suleymanov works for a company owned by his mother[.] Mr. Suleymanov testified that he dispatches trucks from home, working from about 9:00 a.m. until 6:00 or 7:00 p.m., Monday through Friday. Mr. Suleymanov testified that he earns $1,400.00 per month. The parties began living together in June 2015. The child was born on March 25, 2016. One piece of uncontroverted testimony is that Mr. Suleymanov traveled via air transportation twice a month for approximately a year as he and the Defendant dated. It is not clear how the parties met. Ms. Azizova testified that Mr. Suleymanov kicked her out of the home in mid-October, 2016. Ms. Azizova stayed in the local Days Inn for one (1) night. Her cousin from Philadelphia came and picked her up and she and the child went to Philadelphia for a few days. She testified that her parents came from Georgia and then brought her back to the Suleymanov home [] where she continued to live until the end of December, 2016. The other uncontroverted testimony is that the intention in late December was to spend approximately eight (8) days in Georgia visiting Defendant's family. The evidence shows that the Defendant purchased a round-trip ticket. Mr. Suleymanov and his mother drove Ms. Azizova and the child to the airport. Ms. Azizova testified that approximately two (2) days after arriving in Georgia that Mr. Suleymanov packed her personal belongings, the child's clothing, and furniture and shipped the same to Georgia. Ms. Azizova testified that this action was not requested by her, but rather initiated by Mr. Suleymanov. [T]he Household Goods Bill of Lading, includes a listing of the child's belongings. One might ask why Mr. Suleymanov would ship the child's belongings to Ms. Azizova, a mother he contends took little care of the child.

In June 2016, there was a dispute between the parties, Ms. Azizova testified that Mr. Suleymanov cut-off a credit card that she carried. In late October or November, Ms. Azizova began working at Best Buy on a part-time basis, approximately twenty-four (24) hours per week. Additionally, she had started school at Hagerstown Community College, taking three (3) classes and being in school from approximately 12:00 p.m. until 7:00 p.m.,

---

[4] Georgia, as used here, refers to the State, where Mother and A. resided upon leaving Maryland rather than the Mother's country-of-origin, Georgia of the Caucasus region of Eurasia.

three (3) days per week. Mr. Suleymanov testified that he and his mother took care of the child while Ms. Azizova was in school and/or working. Mr. Suleymanov did not want Ms. Azizova to work. Ms. Azizova testified that she needed to work so that she would have money for the child. Mr. Suleymanov countered that between his funds and his mother's assistance, the family and the child had all they needed. Mrs. Suleymanova, Mr. Suleymanov's mother testified that she works 3 to 4 nights per week as a nurse from 10:30 p.m. to 7:30 a.m. Her work schedule and her son's work schedule in the home would seem to indicate that they would share the responsibility of taking care of the child while Ms. Azizova was in school and/or working. Ms. Azizova testified that Mr. Suleymanov seldom took care of the child, telling her it was the mother's job.

(alterations added).

The magistrate found that the parties had had a volatile relationship, that the paternal grandmother had cared for A. when Mother was not home, but that Mother should have primary physical custody of A.:

Here, both parties contend that the other physically abused him or her. Both parties denied that such behavior was exhibited to the other party so the credibility issue is a complete wash and the Magistrate would find that both parties are less than forthright about their behavior. It is clear that this relationship has turned very volatile. It is easy to find that both of these parties have engaged in physical and verbal abuse of the other. The home life appears to be very unhealthy for the parties and the child. Although Mr. Suleymanov suggests that he cared for the child during the day, that is difficult to manage when you are attentive to your work. The conclusion might be that Mrs. Suleymanov[a] may have provided care when Ms. Azizova was out of the home.

The current situation where Mr. Suleymanov lives in Hagerstown and Ms. Azizova lives in Georgia makes for a difficult arrangement for custody and visitation. The child is but 13 months old. The distance is substantial and there is no workable relationship between the parents. Ms. Azizova expresses concern that the child might be injured/abused absent supervised visitation in Georgia. There is no credible evidence that Mr. Suleymanov has harmed the child. Although Mr. Suleymanov's care of his daughter may be less than his testimony suggests, with Ms. Azizova attending college and working, there are certainly times when Mr. Suleymanov and/or his mother were caring for [A.]. The recommendation will be that Ms. Azizova has sole legal custody and primary physical custody of the minor child.

16

The magistrate did recommend that Mr. Suleymanov receive visitation rights consisting of one week per month with A.

Father subsequently filed exceptions to the magistrate's Proposed Findings and Recommendations on May 19, 2017, to which Mother replied. On August 11, 2017, the circuit court entered a pendente lite order memorializing an agreement between the parties that granted Mother temporary sole legal custody and primary physical custody of A. until a "decision on the merits could be made." On January 16 and 17, 2018, as well as March 16, 2018, the matter came before a trial judge in the Circuit Court for Washington County.[5]

The trial court entered an order on August 28, 2018, awarding Father primary physical custody and joint legal custody with Mother, with Father having tie-breaking authority. The order also provided Mother with visitation:

> Beginning August 19, 2018, the parties shall have an alternating schedule consisting of four (4) consecutive weeks with Mr. Suleymanov followed by two (2) consecutive weeks with Ms. Azizova. This alternating schedule shall continue until September 2021, at which time the minor child shall be mandated to begin school; it is further
>
> **ORDERED** that once school begins in September, 2021, the child shall be in the custody of Mr. Suleymanov during the school year. Ms. Azizova shall have visitation during the minor child's winter break, spring break, and for two (2) months of summer vacation[.]

---

[5] Over the course of the three-day trial, the following individuals testified: Muzaffar Suleymanov, Father; Natella Azizova, Mother; Aynura Muradova, Father's cousin; Rashid Suleymanov, Father's father; Gulnara Suleymanova, Father's mother; Svetlana Suleymanova, Father's aunt; Nancy Luann Thompson, a friend of Mother's family from the church-sponsored World Relief Resettlement Organization located in the Alpharetta, Georgia area; Yulduz Martanovana, Mother's mother; Veysal Badalov, Mother's cousin; Randy Rourke, a private investigator hired by Mother to observe Father; Zafar Azizo, Mother's father; and Mazilla Malvadova, Father's aunt.

The order memorialized an oral recitation of the trial judge, who had provided her reasoning based upon the "custody factors that are handed down to me from the higher courts that I must consider. I've done so. Believe me, I've given this case tremendous amount of thought."

Although the trial judge considered all of the relevant factors pertaining to the determination of physical and legal custody, her findings with respect to factors one and thirteen, "the fitness of the parents" and "the demands of parental employment and opportunities for time with the child," respectively, are of particular import.

With respect to "[f]actor one, the fitness of the parents," the trial judge questioned the ability of the mother to parent based, primarily, upon a singular event in May of 2016 in which Mother, then under twenty-one years of age, attended a concert in Atlantic City with Father and his cousin and allegedly became drunk. The trial judge had "concern" that, Mother's behavior at the concert demonstrated that she excessively drank and that Mother needed to have "the opportunity to sow her wild oats," as a result of her youth, rather than parent:

> There were certain issues that in the Court's opinion repeatedly showed themselves through the - - through the testimony, through the evidence specifically regarding the mother of the child. There were incidents cited about violence where Ms. Azizova was - - would have angry outbursts and would display her anger oftentimes against Mr. Suleymanov. Another reoccurring theme was Ms. Azizova's excessive drinking. And although there was certainly allegations that Mr. Suleymanov consumes alcohol, <u>the incident in Atlantic City really stands out in the Court's mind</u>. Ms. Azizova is a young mother, very young, transplanted to Hagerstown, Maryland, has a child, enters into a relationship and has a child before she's even legally able to drink and wants, in this Court's opinion, has not had the opportunity to sow her wild oats, as they say, to engage in fun times that generally

18

people in their early twenties engage in. So when provided an opportunity to have that, to be in that type of situation to - - to not be responsible for the child, to be at a - - to participate in entertainment, to participate in - - in a fun event such as a concert in Atlantic City, the testimony that I heard, not only from Mr. Suleymanov, but also from his cousin, who if memory serves me, I believe is a - - is a nurse, she's in the medical profession, that testimony was that she was, Ms. Azizova, was excessively drunk, falling down and displaying violence. <u>As to her fitness, those two issues cause the Court some concern.</u>

(emphasis added).

With respect to the thirteenth factor considered by the trial judge, "the demands of parental employment and opportunities for time with the child," she concluded that the factor weighed in favor of Father, because Mother chose to leave her "little fragile infant in the house" during a period of "the child's life [that is] so fragile and critical" to obtain part-time employment and education, although Mother was not financially wanting because she "was provided with what she needed":

So as I indicated, Mr. Suleymanov is employed full-time through a - - a family business. But the family business is capable of bringing on another employee and he's - - he's also capable of doing work at different times so that perhaps when the child is napping or the child goes to bed or if she's - - if you're lucky enough to have a child that sleeps in, he could get some work accomplished during those times. He has flexibility. Ms. Azizova works part-time and is also enrolled in school. What's <u>concerning to the Court</u> is that when this little girl was born, those first three months of the child's life are so fragile and critical and require so much attention. It gets a little bit better after three months. And then as time goes by, it - - it certainly improves, the more independent the child gets, the better. But what's concerning to the Court, what really struck me was that Ms. Azizova has this - - this newborn infant, clearly has difficulties with Mr. Suleymanov's mother, even testified that she didn't like the way Mr. Suleymanov's mother bathed the child, specifically that there was tapping of the head of the child while bathing her and that Ms. Azizova didn't - - didn't like that. So and Mr. Suleymanov lives with his - - his mother. So she's a - - a joint caretaker of this child. So while having this little fragile infant in the house, when the credit card gets cut - - cut off, when her money, her unlimited spending gets

19

cut off, she leaves that little infant and goes and gets a job and enrolls herself in - - Hagerstown Community College. This did not come across to me as a case where the mother working was a financial necessity. I recognize that there are plenty of family - - a number of families out there where there is no choice. In order to get diapers, both parents must work. In order to pay the rent, both parents must work. That wasn't the situation here. She was provided with what she needed. She was also provided with a credit card that she could spend freely on. And it wasn't until that was spent in excess that she then decides it's about her again. She wanted to have spending money. She wanted her own car even though she was provided with a Mercedes to drive. She was going to go to school. She did that. And it sounded to me that to Mr. Suleymanov and his family that that move on her part was a surprise. The demands of her employment for factor number thirteen is created by her. But in terms of the second part of that factor, opportunities for time with the child, she has time because, again, she's in a situation that she's created.

(emphasis added).

Upon her consideration of other relevant child custody factors,[6] the judge made

further findings and provided additional comments pursuant to the twentieth factor she

---

[6] The trial judge also made factual findings with respect to the other child custody factors delineated by case law, which are summarized as follows:

As to the second factor considered by the trial judge, the "character and reputation of the parties," she "didn't place too much weight on - - on that specific factor."

The trial judge found the third factor, "the request of each parent and the sincerity of the request," to weigh in Father's favor based upon his prompt filing for custody, noting that she did not "sense" a similar sincerity in wishing to obtain primary custody of A. from Mother:

What's striking to me is that when Mr. Suleymanov realized his child is not coming home, he filed for custody. My recollection is he filed January 10th just literally days after the child should have been home. And then he has maintained his position that he wants this child. He has continued in his efforts and has taken - - has availed himself of the courts, has done what he can through our legal system to get this child back. I didn't get that - - I have no doubt that Ms. Azizova wants the child to remain with her. But in

(continued . . .)

20

(continued . . .)

terms of that, there was a - - a sincerity from Mr. Suleymanov regarding the situation that I - - I - - I wasn't able to discount and I did not sense from Ms. Azizova.

The trial judge found that the fourth factor, "any agreement between the parties," to be inapplicable because "[f]or purposes of this - - these proceedings, I find that there is no agreement between the parties."

The trial judge found that, "the willingness of the parents to share custody," the fifth factor she considered, weighed in favor of Father based upon Mother's unwillingness to move back to Maryland to share custody with Father because Mother "wants to engage in a broader social life[,]" which "Hagerstown does not have as much to offer" compared to Atlanta, Georgia:

Again, what I found striking through the evidence was that when Mr. Suleymanov was asked, "If the child remains in Georgia, would you consider moving there?" And he said, "Yes." When Ms. Azizova was asked the same thing, she indicated, "No." I recognize, again, this is a - - a young woman who wants to engage in a broader social life. And to summarize her testimony, Hagerstown doesn't have much to offer. And just taking judicial notice of Hagerstown, Maryland, versus Atlanta, Georgia, or the suburbs of Atlanta, Georgia, she's right in the sense that Hagerstown does not have as much to offer, does not have as many - - the nightlife here isn't much to speak of. What concerned me is that if faced with the possibility that the child will be in Maryland, will reside in Maryland, her concern was Hagerstown doesn't have much to offer her, not, "I will go anywhere to be with my child."

The trial judge also found factor six, "each parent's ability to maintain the child's relationships with the other parent, siblings, relatives and other person who may psychologically affect the child's best interest," favored Father based upon Mother living in Georgia with A., away from Father and his extended family, positing that Mother's choice to remain in Georgia with the child was an attempt to alienate A. from Father:

Certainly both sides have extended family. I heard from not only the maternal and paternal grandparents, but I also heard that there are aunts and uncles and - - and for the child, great-grandparents. There - - there's extended family. Ms. Azizova, I believe has a brother. There's - - there's family on both sides. Mr. Suleymanov, I believe recognizes the value and the importance of family and extended family. That extended family run through this little girl's veins. She's a part of that on both sides. I believe he recognizes that value in Ms. Azizova's family as well that that - - that the

(continued . . .)

21

(continued . . .)

child has that family as well. I see the importance he places on extended family by hearing that in his own home, people that were referred to as, "The elders," extended family, were in his home or that he would visit uncles, other family and at one point taking, at least at one point taking the child with him. What I also found interesting is that in times of trouble that Mr. Suleymanov and his family opened their doors to Ms. Azizova's family to come in and to discuss matters, to have discussions, which indicates to me a recognition of the other side. Ms. Azizova on the other hand, took the child to Georgia. And not only did she not place much value on the child seeing extended family but didn't place value on the child seeing dad, seeing the father. I'm concerned that if Ms. Azizova has significant control that alienation may occur. In this Court's opinion, she already tried it once. It didn't work because as Mr. Suleymanov testified after not seeing his child for a long time, he expressed to the Court that he was nervous, he was worried that the child wouldn't recognize, that the child wouldn't know him. And then he tells a beautiful story of how the child runs to him and rests on him indicating to this Court that there's certainly a bond there. But that wasn't a bond that was nurtured by mom, and it should be nurtured by both parents. This little girl only has one mom and one dad for the rest of her life. That's it. You get one mom and one dad. And both sides should be encouraging a healthy, good relationship with the other parent.

(emphasis added).

With respect to "the age and number of children each parent has in the household," the seventh factor considered by the trial judge, she found that the "testimony was that neither party has additional children."

The trial judge also found that the eighth factor she considered, "the preference of the child when the child is a sufficient age and capacity to form a rational judgment," did not apply because A. "is far too young to make any - - to have any decision or - - or input into these proceedings."

As to the ninth factor considered by the trial judge, "the capacity of the parents to communicate and to reach shared decisions affecting the child's welfare," she explained:

Do these two people have the ability to communicate? And this factor is especially important when the Court considers legal custody. And legal custody is the important decision making for the child. We will not look to her to make decisions about education, about religion, about medical decisions. She's - - we look to the parents. So the issue for the Court is, are these two people capable of talking, having a meaningful discussion? If heaven forbid a doctor says, "This child should have surgery," will Mr.

(continued . . .)

22

(continued . . .)

> Suleymanov and Ms. Azizova be able to have a meaningful, calm, rational discussion about the options? I find that at times, yes. There have certainly been difficulties. There have been times that the parties didn't speak. But are capable of communicating? I think so.

The trial judge then considered "the most frustrating factor for the Court to consider," the geographic proximity of the parents' residences and opportunity for time with each parent, and found: "Clearly, this is the most frustrating factor for the Court to consider because the two parties are now a vast distance apart. Ms. Azizova resides in Georgia. Mr. Suleymanov resides in Washington County, Maryland. It's a significant difference."

With respect to the eleventh factor considered by the trial judge, "the ability of each parent to maintain a stable and appropriate home for the child," she noted that: "Both rely on family for housing. I didn't hear any testimony that caused me to be concerned about - - about either party's home."

The trial judge then found that the twelfth factor she considered, "the financial status of the parents," weighed in favor of Father because his employment, as he testified, allowed him greater flexibility to care for A., while evidence adduced at trial indicated that Mother had "some employment" in Georgia and that she was enrolled in school. Accordingly, the judge noted that, because Father possessed regular work, work which he could step back from in order to care for A., he was "more stable" in "terms of financial status":

> Mr. Suleymanov is employed through a family business and testified that in order to make accommodations for his daughter, for him to be available for his daughter that the business has taken on and can take on an additional employee so that he has the time to - - to devote to his daughter. Ms. Azizova relies on family support. While in Hagerstown, she went and obtained her own employment at Best Buy. Testimony that she has some employment in - - in Georgia and that she's also enrolled in school as she was here in Hagerstown. In terms of financial status, I - - Mr. Suleymanov is more stable in that sense.

The judge further noted that, pursuant to fourteenth factor she considered, "the age, health and sex of the child," "[w]e have a healthy little girl born March 25th of 2016."

She then considered "the relationship established between the child and each parent" to determine that both parents shared a bond with A.:

> I have no doubt that both - - that each parent is - - is - - has a bond with this child. The child has primarily resided with Ms. Azizova. I have no doubt that the child feels bonded to her mother. But as I just relayed, there's the

(continued . . .)

23

(continued . . .)

> story of Mr. Suleymanov picking the child up at the airport, and the child out of all those people in the airport, thousands of people in the airport, she went to him. And not only did she go to him, she's so young, she rested on him, which indicates to me there's a bond.

Pursuant to the sixteenth factor considered by the judge, "the length of separation of the parents," she noted that, "they've been separated since December of 2016."

Upon consideration as to "whether there's been a prior voluntary abandonment or surrender of custody of the child," the trial judge concluded that there had not, noting that, although Father and A. had been separated, it was not based upon a voluntary action of Father:

> Although Mr. Suleymanov has been separated - - there have been times where Mr. Suleymanov was separated for - - for long periods of time from this child, he followed his legal avenues to come to court and - - and fight for this child. Unfortunately, it's taken some time to get to this point, but the day has arrived.

The trial judge next considered an eighteenth factor, the "potential disruption of the child's social and school life," finding that:

> There's no school life to be concerned about at this time. As far as her social life, it's a little funny to think about a social life for a child of this age. But in a sense, she does have a social life. She has her world, what she's used to, the people that she's used to, her - - her toys, her room, her activities. That's her – her friends, that's - - that's her little social life. So would there by a disruption to her social life? Perhaps. But I find that it would be minimal because of her age and that she already is familiar with her life in Maryland and her life in Georgia. And she's also already used to traveling, unfortunately. But that wouldn't be new to her.

The judge also found that there would be no impact on state or federal assistance stemming from her custody determination, pursuant to the nineteenth factor. The magistrate, however, noted that Mother received "Medicaid and WIC for the benefit of the child."

considered, "any other consideration the Court determines to be relevant to be in the best interest of the child." She noted a "driving theme" that she had observed throughout her analysis of the factors, finding that Ms. Azizova was immature, placing a greater significance on money and a social life than she did the well-being of A. Although she noted that Father probably also "likes to have a good time," he maintained a level of responsibility, unlike Mother, "because he's not living life for himself," again, citing the incident of drinking in Atlantic City:

> Here, as many times as I sat down to author this Opinion, there was one driving theme. Ms. Azizova displays a great deal of immaturity, her drinking, her partying, her fighting, the aggression, her frustration that there's not enough to do in Hagerstown, her spending, the value she places on expensive things, the fact that when she left Hagerstown, she collected her perfumes, she collected her jewelry. There's a significance that she places on - - there's a significance that she places on money. And that causes her to not be focused on what's truly important, and what is truly important is this child. I didn't see that from Mr. Suleymanov. I don't doubt that he likes to have a good time. Don't we all? But he attended the concert in Atlantic City as well, didn't hear about him hitting anyone. I didn't hear about him falling down drunk. There was still a level of - - he maintained a level of - - of responsibility because he's not living his life for himself, just for himself anymore. He has to consider his child. I didn't get that sense from her.

Upon consideration of the twenty factors in her custody determination, the trial judge awarded Father primary physical custody of A. and concluded:

> So having considered the best interest of the child factors, the Court finds that the factors weigh in favor of Mr. Suleymanov. Based on that, the Court awards Mr. Suleymanov primary physical custody of the child. Visitation is awarded to Ms. Azizova. I'm - - the schedule that has existed, one - - one week a month, correct, that's what's been happening, that's a lot of traveling for this little girl. And in terms of stability, I think she'll have that with her father.

25

She, then, established the visitation schedule:

> So the schedule shall be father will have the child four weeks. When I was thinking this through, I - - I thought Sunday and then look at a calendar and count four Sundays. And on that fourth Sunday, the child will be with mom for two weeks. And then the child returns to dad and will be with dad for four weeks. And then the child returns to dad and will be with dad for four weeks. I'm doing that and that will continue until 2021. I'm doing it in this fashion because the child needs to establish a stable life here in Hagerstown. But at the same time, the child needs to spend time with mom and spend time with that family. So that schedule will continue until 2021 when the child, by my calculations, the child on - - will then have to be enrolled in school. The child will be a resident of the State of Maryland. This Court will retain jurisdiction over this case. And by Maryland law, the child must be enrolled in school if she is five years old on September 1st, and I believe that happens in 2021. So the schedule as I just outlined will continue until she's ready for school, till she's - - September of 2021, at which time, the schedule will change. Dad will have custody of the child in order to create stability for the school year. Traveling away will no longer be a - - a - - an option because it will disrupt her education too much. And I realize in the first couple years for a few years perhaps that's not so significant, but it will become significant very quickly. So once she's enrolled in school, and she will be enrolled in the - - whatever school district the father resides in, throughout the school year, dad will have the child. Mom will have what used to be called Christmas break. I think they call it winter break now. And then what used to be called Easter break, I think it's called spring break now. She will have those two weeks of visitation. And then she will also have two months in the summer. As to the summer months, I'm not putting a specific time frame, just she gets two months. I'm recognizing that perhaps Mr. Suleymanov would like to take a vacation, do something, some summertime activity with the child. So he will have a little bit of summer with the child. But for purposes of maintaining as much of a relationship with mom as possible, mom will have two months.

The trial judge also considered the legal custody of A. and ordered joint legal custody.[7]

---

[7] The judge observed:

> As far as legal custody is concerned, as I indicated, I do think these parties have the ability to communicate, and you need to communicate. You need

(continued . . .)

Mother then noted this timely appeal.

---

(continued . . .)

to have meaningful discussions about school. If religion is important to either of you, you need to have that discussion. You need to have meaningful discussions about medical decisions. Both parents need to be informed of even - - even the smallest medical decisions, a routine dentist appointment, flu shot, whatever, a skinned knee that causes an emergency room visits. Both parents need to be aware of that. I encourage both of you to - - to take that even a step further. That if the child is with Ms. Azizova and has a runny nose or a mild cough or something, share that with the other parent. "Oh, this morning, she woke up and she had a slight fever, but we gave her some Tylenol and she - - she appears to be okay now." Share that. Because each of you deserves to have input and deserves to have knowledge of what's happening. And, unfortunately, because you're so far away, it's not a situation where one parent can - - can stop by, one parent can just meet you at the doctor's office. That's not going to happen. Talk about what's happening in your daughter's life because that's important to your daughter. It's important to her. She' doesn't understand it yet, but she's human. She senses anxiety. She senses anger. She might not be able to tell you about it yet, but she's a human being that recognizes every time mommy's on the phone with daddy, she's angry. Every time mommy calls, daddy doesn't want to answer the phone. She know- she senses that - - in her little body, she knows. Do what you need to do to get past that because she's watching. She only has two parents, and she's looking to you to guide her, to make her into a wonderful adult that I have no doubt she will be. And remember, one day she'll be eighteen years old. She will be an adult. But your obligations to her, your - - your moral obligations and your - - your bond to her will not end. The two of you are in this until the day they put you into the ground. Because one day, she's going to get married, and you're both going to be there. And she's going to graduate from college, and then she's going to graduate from law school or medical school or whatever brilliant path she takes, and you're going to be there, both of you. She deserves to see both of her parents present and happy. So as far as - - as far as legal custody is concerned, I'm ordering joint legal custody. Because of the frustrations with Ms. Azizova because of the times that she - - that she has caused communication to be difficult, I'm awarding Mr. Suleymanov tie-breaking authority[.]

27

**DISCUSSION**

Mother primarily argues that the factual findings underpinning the trial judge's custody decision were clearly erroneous; which, in turn, resulted in the trial judge abusing her discretion by awarding Father primary physical custody of A. Mother posits that the trial judge relied on "dated, stale, and irrelevant evidence" in making the factual findings which supported the custody determination. Mother further contends that, although the trial judge discussed the relevant custody factors established by case law on the record, such a discussion amounted to a "mechanical and perfunctory recitation . . . without any particular in-depth analysis and review of the evidence adduced at trial." As such, Mother requests that the judgment of the circuit court be reversed and remanded, with a reinstatement of the prior pendente lite order until such time as those proceedings are concluded. At the remand, Mother also implores that a custody evaluation be conducted and that a best interest attorney be appointed to represent A. to determine a custodial arrangement that will be in the best interest of the child.

Father, conversely, avers that the trial judge's decision to award him primary physical custody of A. was based on relevant evidence and factual findings that were not clearly erroneous. As such, Father urges that the trial judge did not abuse her discretion in rendering her final judgment.

Our review of child custody determinations consists of three interrelated standards of review. *Reichert*, 210 Md. App. at 303 (citing *Gillespie v. Gillespie*, 206 Md. App. 146, 170 (2012)). The Court of Appeals, in *In re Yve S.*, 373 Md. at 586, explained:

28

> When the appellate court scrutinizes factual findings, the clearly erroneous standard of [Md. Rule 8-131(c)] applies. [Secondly,] [i]f it appears that the chancellor erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion.

(citations omitted). The reviewing court, therefore, gives due regard "to the opportunity of the lower court to judge the credibility of the witnesses." *Id.* at 584 (quoting *Davis v. Davis*, 280 Md. 119, 125–26 (1977)). We further acknowledge that "it is within the sound discretion of the [trial court] to award custody according to the exigencies of each case, and . . . a reviewing court may interfere with such a determination only on a clear showing of abuse of that discretion." *Id.* at 585 (citation omitted).

An "appellate court does not make its own determination as to a child's best interest; the trial court's decision governs, unless the factual findings made by the lower court are clearly erroneous or there is a clear showing of an abuse of discretion." *Gordon v. Gordon*, 174 Md. App. 583, 637–38 (2007) (citing *Boswell*, 352 Md. at 224; *Griffin v. Crane*, 351 Md. 133, 154 (1998); *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 311 (1997); and *Petrini v. Petrini*, 336 Md. 453, 470 (1994)). A trial court's findings are "not clearly erroneous if there is competent or material evidence in the record to support the court's conclusion." *Lemley v. Lemley*, 109 Md. App. 620, 628, *cert. denied*, 343 Md. 679 (1996). An abuse of discretion occurs where "'no reasonable person would take the view adopted by the [trial] court' or when the court acts 'without reference to any guiding rules or

29

principles.'" *Santo*, 448 Md. at 625–26 (2016) (quoting *In re Adoption/Guardianship No. 3598*, 347 Md. at 312).

In the present case, the trial judge considered many, if not all, of the relevant factors and made factual findings consistent with the limited record that was presented, absent any professional evaluation of parental fitness and best interest considerations. In the absence of any discernable evidence regarding the needs of A., the trial judge relied, in the areas of most "concern" to her, on stereotypes about the fragility of infancy which did not apply as A. was 31 months old at the time the judge rendered her decision; and the mother's inability to function in the best interest of A., because of Mother's youth, her part-time work and enrollment in school, as well as an incident of drunkenness in which the father was involved, although A. was not present.

There was not one scintilla of evidence, however, that linked the mother's behavior as a part-time worker and student to an adverse impact on A. or her development, nor, for that matter, with regard to the drinking episode in the past, when the child was not present. The judge's assumption that a youthful parent, especially a woman, must "sow her wild oats" in derogation of any ability to meaningfully contribute to her child is not supported by any of the evidence in this record. Also lacking an evidentiary foundation is the judge's determination that it is not appropriate for a mother with a young child to work or attend school, absent a financial necessity. None of the "concerns" of the judge regarding Mother that yielded her decision to award custody of A. to Father has any basis in the record linking Mother's actions to adverse effect on the child.

30

It is clear, that on remand, the judge and parties must be held to proof of what is in

A.'s best interest, through meaningful evaluation of her development.[8]

---

[8] A trial judge has the ability to order a custody evaluation, which is defined, pursuant to Rule 9-205.3(b)(3), as "a study and analysis of the needs and development of a child who is the subject of an action or proceeding under this Chapter and of the abilities of the parties to care for the child and meet the child's needs." Rule 9-205.3 further provides, in part:

> (a) **Applicability.** This Rule applies to the appointment or approval by a court of a person to perform an assessment in an action under this Chapter in which child custody or visitation is at issue.
> ***
> (b) **Authority.** (1) On motion of a party or child's counsel, or on its own initiative, the court may order an assessment to aid the court in evaluating the health, safety, welfare, or best interests of a child in a contested custody or visitation case.
> (2) The court may appoint or approve any person deemed competent by the court to perform a home study or a specific issue evaluation. The court may not appoint or approve a person to perform a custody evaluation unless (A) the assessor has the qualifications set forth in subsections (d)(1) and (d)(2) of this Rule, or (B) the qualifications have been waived for the assessor pursuant to subsection (d)(3) of this Rule.
> (3) The court may not order the cost of an assessment to be paid, in whole or in part, by a party without giving the parties notice and an opportunity to object.
> ***
> (f) **Description of Custody Evaluation.** (1) Mandatory Elements. Subject to any protective order of the court, a custody evaluation shall include:
> (A) a review of the relevant court recordings pertaining to the litigation;
> (B) an interview of each party;
> (C) an interview of the child, unless the custody evaluator determines and explains that by reason of age, disability, or lack of maturity, the child lacks the capacity to be interviewed;
> (D) a review of any relevant educational, medical, and legal records pertaining to the child;
> (E) if feasible, observations of the child with each party, whenever possible in that party's household;
> (F) factual findings about the needs of the child and the capacity of each party to meet the child's needs; and

(continued . . .)

31

(continued . . .)

(G) a custody and visitation recommendation based upon an analysis of the facts found or, if such a recommendation cannot be made, an explanation of why.

\*\*\*

(n) **Fees.** (1) Applicability. Section (n) of this Rule does not apply for a county in which all custody evaluations are performed by court employees, free of charge to litigants.

\*\*\*

(3) Allocation of Fees and Expenses. As permitted by law, the court may order the parties or a party to pay the reasonable and necessary fees incurred by an individual appointed by the court to perform an assessment in the case. The court may fairly allocate the reasonable and necessary fees of the assessment between or among the parties. In the event of the removal or resignation of an assessor, the court may consider the extent to which any fees already paid to the assessor should be returned.

The judge also has the ability to appoint a best interest attorney, pursuant to Rule 9-205.1, which, in pertinent part, provides:

(a) **Applicability.** This Rule applies to the appointment of an attorney for a child in actions involving child custody or child access.

(b) **Factors.** In determining whether to appoint an attorney for a child, the court should consider the nature of the potential evidence to be presented, other available methods of obtaining information, including social service investigations and evaluations by mental health professionals, and available resources for payment. Appointment may be most appropriate in cases involving the following factors, allegations, or concerns:

(1) request of one or both parties;

(2) high level of conflict;

(3) inappropriate adult influence or manipulation;

(4) past or current child abuse or neglect;

(5) past or current mental health problems of the child or party;

(6) special physical, educational, or mental health needs of the child that require investigation;

(7) actual or threatened family violence;

(8) alcohol or other substance abuse;

(9) consideration of terminating or suspending parenting time or awarding custody or visitation to a non-parent;

(10) relocation that substantially reduces the child's time with a parent, sibling, or both; or

(continued . . .)

> (11) any other factor that the court considers relevant.
>
> (c) **Appointment order.** (1) Content.  An order appointing an attorney for a child shall:
>
> (A) specify whether the attorney is to serve as a Child's Best Interest Attorney, Child's Advocate Attorney, or Child's Privilege Attorney;
>
> (B) authorize the appointed attorney to have reasonable access to the child and to all otherwise privileged or confidential information about the child, without the necessity of any further order of court or the execution of a release;
>
> (C) permit the attorney to participate in discovery under Title 32 of these Rules as though the child were a party;
>
> (D) provide that the service and notice provisions in Title 1 of these Rules apply as though the child were a party;
>
> (E) state any other duties and responsibilities required by the court;
>
> (F) state when the appointment terminates; and
>
> (G) unless the attorney has agreed to serve pro bono public, include provisions concerning compensation for the attorney.

*See also* Md. Code (1984, 2012 Repl. Vol.), § 1-202 of the Family Law Article.

The rules provide that the cost for a custody evaluation or for the appointment of a best interest attorney may be assessed against the parties; nevertheless, we take judicial notice that, according to the Washington County Circuit Court website, if income eligible, Family Law Funds may be made available to assist in such payment.  *See* Family Services Program, Clerk's Office, Circuit Court for Washington County, https://www.courts.state.md.us/clerks/washington/family, last visited Nov. 1, 2019 [*archived at* https://perma.cc/7WPS-C76B]

As a result, we vacate the judgment and remand for a new hearing which must include a

thorough and deliberate evaluation of A.'s needs and the parents' fitness.[9]

> **JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY VACATED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.  COSTS TO BE PAID BY APPELLEE.**

---

[9] At oral argument, there were comments made regarding this custody case being related to a "property issue" and "how much was paid for her."  The statements regarding financial remuneration for the mother and/or child give concern to this Court, so much that the Maryland Department of Human Services, Child Protective Services, or the applicable Washington County department, should review the circumstances in which A. finds herself.