*Frank Gerard Gizzo v. Kaycee Lauren Gerstman*, No. 3236, Sept. Term 2018.  Opinion by Arthur, J.

**CUSTODY AND VISITATION—EVIDENCE OF PRIOR ABUSE OR NEGLECT**

In this custody dispute between a mother and father, the court awarded sole legal custody and primary physical custody of a four-year-old child to the child's mother, even though the mother had been found guilty of assaulting the father and neglecting the child three years earlier.  Under the circumstances, the custody decision was not an abuse of discretion.

In custody and visitation cases, courts must give special consideration to evidence that a party previously committed abuse or neglect.  Section 9-101 of the Family Law Article dictates that, if there are reasonable grounds to believe that a party abused or neglected a child, the court must determine whether abuse or neglect is likely to occur if the court grants custody or visitation rights to that party.  Unless the court specifically finds that there is no likelihood of further child abuse or neglect by that party, the court may not grant custody or unsupervised visitation rights to that party.  Section 9-101.1 further requires the court to consider evidence of abuse by a party against certain family members and household members.  If the court finds that the party committed such abuse, the court must make arrangements for custody and visitation that best protect the child and the victim of the abuse.

In this case, the court found, pursuant to § 9-101, that there were reasonable grounds to believe that the mother had neglected the child, but specifically found that there was no likelihood of further child abuse or neglect by the mother.  The court credited testimony that, in the intervening years, the mother worked to overcome mental health challenges and established a new home in which she and her husband were raising their other young children without incident.  The court's determination was neither clearly erroneous nor an abuse of discretion.

In its initial opinion, the court did not expressly discuss § 9-101.1 or the evidence that the mother was found guilty of assaulting the father three years earlier.  In a subsequent order denying the father's motion for an emergency stay, however, the court explained that it had considered the evidence of abuse and determined that the geographical distance between the parents would minimize conflict between them and provide the protection contemplated by § 9-101.1.  These statements sufficiently demonstrated that the court had considered the evidence of abuse and exercised its discretion to make appropriate protective arrangements.  To the extent that the initial opinion might have fallen short of the requirements of § 9-101.1, the subsequent order addressed any such deficiency.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 3236

September Term, 2018
_____

FRANK GERARD GIZZO

v.

KAYCEE LAUREN GERSTMAN

_____

Meredith,
Arthur,
Gould,

JJ.
_____

Opinion by Arthur, J.
_____

Filed: April 1, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

This appeal arises from what the trial judge called "a particularly difficult case" concerning child custody. Based on two separate incidents that occurred in 2015, the mother was found guilty of assaulting the father and neglecting their one-year-old child. The child was placed in the care of his father in Maryland, but the father eventually decided that the child should reside primarily with the child's paternal grandparents in New York. Meanwhile, the mother established a new home and family in California.

In 2019, the Circuit Court for Baltimore County held a two-day trial on the parents' competing claims for custody of their four-year-old child. The court found that the mother had demonstrated her fitness as a parent during the years following her neglect conviction and that there was no likelihood that the mother would commit further child abuse or neglect. The court deemed the mother's request for custody to be more genuine than the father's request, in light of his decision that the child should live with grandparents in another state. The court granted sole legal custody and primary physical custody of the child to the mother.

The father has appealed. Because we perceive no error or abuse of discretion, we will uphold the circuit court's custody determination.

### FACTUAL AND PROCEDURAL BACKGROUND

### A.   Early Relationship Between Father and Mother

Frank Gizzo ("Father") and Kaycee Gerstman ("Mother")[1] first met in 2013 and soon began a romantic relationship. At that time, Father was 24 years old and Mother

---

[1] Since the initial filings, Mother has married and changed her last name to Duree.

was 20 years old. They lived together for a few months in California before moving to New York. For a short time, they stayed with Father's parents in White Plains, until Father's father ("Grandfather")[2] decided that he would no longer permit Mother to stay in that home.

Mother became pregnant sometime in early 2014. During several months of the pregnancy, Mother lived inside Father's car while Father continued to live in his parents' home.[3] Mother moved into a homeless shelter during the final months of the pregnancy. Their son, G., was born in November 2014.

After the birth of G., Grandfather allowed Mother to move back into the White Plains home. While staying there, Mother had an altercation with Grandfather, in which she pushed him and kicked him. Soon after that altercation, Mother and Father decided to move to Maryland.

From March 2015 until August 2015, Father and Mother lived together with G. in an apartment in Baltimore County. Mother served as G.'s primary caregiver, while Father supported the family with his salary as a trainee with the Baltimore City Police Academy. During this time, Mother became pregnant with their second child.

---

[2] This opinion refers to the paternal father as "Grandfather" merely for the sake of convenience. During the first few years of his life, the child spent significant time residing with his paternal grandparents in New York, but he did not reside with his maternal grandparents in California.

[3] According to Mother, she lived in Father's car for "[a]bout six months." According to Father, she was "only in [his] car for a couple of months."

### B. Demise of the Relationship Between Father and Mother

Father and Mother experienced frequent disagreements throughout their relationship, but on August 8, 2015, their relationship began to deteriorate rapidly. On that day, Mother punched Father in the arm while they were attending a "Family Day" event for members of the Police Academy. Later that day, she slapped him in the face.

Based on those acts, Mother was charged with two counts of second-degree assault of Father. Separately, Father filed a civil petition for protection from domestic violence. Mother was arrested. Immediately after her release, she applied for criminal charges against Father and filed her own petition for a protective order, alleging that he had assaulted her during the Family Day incident. Before the court decided whether to issue a final protective order against either party, they mutually agreed to dismiss their respective petitions.

Mother left the family apartment with G. and moved into a shelter operated by the House of Ruth. Under a consent agreement, G. remained in the primary care of Mother, while Father had regular visits with G. on every other weekend and on weekday evenings.

On October 19, 2015, Mother received probation before judgment as to one count of second-degree assault of Father.[4] The court imposed supervised probation, with the condition that she would complete a domestic violence education program with the

---

[4] A sentence of probation before judgment requires a determination of the defendant's guilt, but the defendant "is not convicted of the crime for which he [or she] has been found guilty, unless the [defendant] violates the probation order and a court enters a judgment on the finding of guilt." *Myers v. State*, 303 Md. 639, 647-48 (1985).

House of Ruth. Ultimately, Mother did not fulfill that condition.[5]

With financial assistance through the House of Ruth, Mother moved with G. into a townhouse in West Baltimore, along with a few women she had met during her stay at the shelter.

### C.     Circumstances Under Which Father Assumed Primary Custody

This case began on August 17, 2015, when Father filed a complaint in the Circuit Court for Baltimore County, seeking sole legal custody and sole physical custody of G. Mother counterclaimed, seeking sole legal custody and primary physical custody of G. The custody case was stayed, however, after G. became the focus of a child abuse investigation and juvenile court proceedings.

On December 12, 2015, the Baltimore City Department of Social Services and the Baltimore City Police Department received reports of suspected child abuse at Mother's residence. Officers observed that G. had bruises on his face and a bloodshot eye. Officers transported G. to a hospital, where the hospital staff discovered additional bruises on G.'s back. Mother claimed that G. fell off her bed and onto the floor after she had left G. with a roommate so that she could shower in another room. Mother admitted that she did not seek medical attention until after the police arrived.

Suspecting possible abuse, the Baltimore City Department of Social Services placed G. in emergency shelter care and filed a petition alleging that G. was a child in need of assistance. G. spent several weeks in a foster home before the juvenile court

---

[5] Mother claims that she was ineligible to enroll in the program.

4

placed G. in his Father's care. Grandfather temporarily moved into Father's Maryland home to help Father care for G.

For her role in causing G.'s injuries, Mother was charged with child abuse, second-degree assault, reckless endangerment, and neglect of a minor. Mother initially spent 30 days in jail in connection with those charges. In March 2016, Mother entered a guilty plea to the charge of neglect of a minor, and the State declined to pursue the remaining charges. Mother received supervised probation, with the condition that she would stay for one year at Chrysalis House, a treatment center for pregnant women and women with young children. Mother also spent another 26 days in jail for violating her previous probation.

During the year after Father filed his complaint for custody of G., Mother made several accusations of abuse by Father, none of which have ever been substantiated. In September 2015, a court denied Mother's petition for a protective order because the hearing judge did not credit her testimony that Father assaulted her. In December 2015, Mother petitioned for a protective order based on allegations that G. suffered injuries during his visits with Father, but she dismissed her petition and later acknowledged that her allegations were untrue. At the juvenile court adjudicatory hearing in March 2016, Mother testified that Father raped her, but she later admitted that her testimony was untrue. According to Father, some of Mother's accusations triggered internal investigations by the police department and caused him to be placed on administrative leave for extended periods of time, which impeded his career progress and limited his opportunities to earn overtime wages.

Mother gave birth to the parties' daughter (G.'s younger sister) in April 2016. Shortly thereafter, Father petitioned to establish paternity of the daughter. In her answer, Mother acknowledged that Father was the biological father of the daughter. A few months later, however, the court dismissed the paternity case at the parties' request.[6]

At the end of 2016, Grandfather moved out of Father's apartment and returned to his home in New York. G. lived in Maryland with Father and Father's girlfriend until November 2017, when the relationship between Father and his girlfriend ended. At that time, Father decided that G. should live primarily with his grandparents in New York. Father began having visits with G. no more than six days per month.

Meanwhile, in March 2017, Mother moved back to California, taking the parties' infant daughter with her. After a brief stay with her parents, Mother found work in a series of restaurant management jobs. In July 2018, she married a restaurant manager who has custody of a son from a previous relationship. Mother stopped working outside the home after she became pregnant with her third child.

Despite participating in mediation, Father and Mother reached no agreement regarding custody of G. In April 2018, the circuit court held a hearing with the goal of establishing a temporary custody and visitation arrangement pending the trial. On an interim basis, the court granted sole legal custody and primary physical custody of G. to

---

[6] According to Father, he withdrew his petition to establish paternity of the daughter because he "wasn't convinced" that she was his child. Eventually, a blood test taken in October 2018 established a 99.99% probability that he is the biological father of the daughter.

Father. The court permitted Mother to have two, two-hour visits with G. (their first in-person contact since her move to California) at the food court of a nearby shopping mall. The court ordered Father to provide Mother with access to G. through FaceTime or a comparable video chat service for up to 15 minutes, four times per week.

Mother's access with G. under the interim order became a subject of frequent disagreement. Because G. lived at Grandfather's home and because Father refused all phone communication with Mother, Father relied on Grandfather to facilitate the calls between Mother and G. Mother and Grandfather were not able to work cooperatively on scheduling calls. Father moved for a modification of the interim order, seeking to establish a fixed schedule, limited to two calls per week. At one point, after Grandfather stopped responding to her communications, Mother contacted the police in White Plains and in Baltimore and asked them to check on G.'s welfare. The FaceTime calls between Mother and G. resumed by the fall of 2018, but Mother remained dissatisfied with the duration of the calls. Mother petitioned the court to hold Father in contempt for failure to comply with the interim order.[7]

### E. Trial on the Parents' Claims for Custody

In January 2019, the circuit court held a two-day trial on Father's and Mother's competing requests for custody. The parties provided the court with information about the respective family living arrangements that they had established since they stopped living together. The court received testimony and evidence concerning Mother's assault

---

[7] The circuit court eventually denied her contempt petition as moot when it replaced the interim order with a final custody order.

of Father and neglect of G. in 2015.

Father testified that, on August 8, 2015, Mother "punched [him] in [his] left arm and then she stormed out in front of all of [his] co-workers." Father said that Mother also "slapped [him] in the right side of [his] face" later that day. According to Father, Mother had not previously committed any acts of violence against him before that day. Based on her actions, Mother was found guilty of second-degree assault.

Father was not present when G. sustained injuries while in Mother's care on December 11, 2015, but Father expressed his belief that Mother had "abused" their son. More specifically, Father said: "The last thing that [G.] knows about [Mother] is that she had beat him up and he was taken away from her." Father said that he still had "extreme concerns for [G.]'s safety" based on what he called Mother's "volatile . . . temperament." According to Father, Mother often "snaps," "uses her hands," and "gets violent." Father acknowledged, however, that he had had minimal interactions with Mother since the assault incident in August 2015.

During cross-examination, Father attempted to reconcile his assertions that Mother is "dangerous" with his acquiescence in Mother raising the parties' daughter for more than two years. When asked to explain why he was not concerned for the daughter's welfare in Mother's care, Father responded that his daughter "is a completely different person" than G. He added: "It is a female first of all and it's different."

At the time of trial, Father was working full-time as a police officer and living in a two-bedroom apartment in Baltimore. Father said that he had never used a daycare provider, but instead he had relied on his parents or his girlfriend (until she stopped living

8

with him) to care for G. while he was working. Father explained that his work schedule required him to work 10-hour shifts on four consecutive days, followed by three days off. Father would alternate between working day shifts for four weeks and then night shifts for four weeks. Father mentioned that he often works overtime.

Father confirmed that, since November 2017, G. had been residing primarily with Grandfather in White Plains, New York. Father said that he was using FaceTime to speak with G. daily, but that G., as a four-year-old child, would not remain interested in a conversation for more than a few minutes at a time. Father explained that he had been having visits with G. "[p]robably once or twice a month," for three days at a time. In other words, Father said, he had been seeing G. on as many as six days per month or as few as three days per month. Sometimes, Father would travel to New York to visit G. Other times, Grandfather would bring G. to Maryland, where they would use bunk beds in the second bedroom of Father's apartment.

During direct examination, Father was asked whether he would be "able to assume custody" if "the [c]ourt did not believe that it was in [G.'s] best interest to stay with and primarily reside with his paternal grandfather[.]" In response, Father said that he "would be able to" assume custody because he expected that his schedule would soon change to a "more daycare friendly" schedule, with eight-hour shifts on five consecutive days.

Grandfather, a retired police officer, testified that he owns a single-family, three-bedroom home in White Plains, New York. Grandfather lives there with his wife, who works as a registered nurse, and his daughter, who attends high school. Grandfather explained that, as a retiree, he is able to stay home to care for G. without relying on a

9

daycare provider. Since September 2018, G. had been attending preschool at a private, Catholic-affiliated school near Grandfather's home. Grandfather had been paying all daily expenses associated with G., except that Father would reimburse Grandfather for preschool tuition payments.

In her testimony, Mother recalled that she had been G.'s primary caregiver for the first year of G.'s life. Mother testified that, while she was living with Father, she felt "controlled" and "overwhelm[ed]" by Father's "demands." Mother acknowledged that, on August 8, 2015, she had a "disagreement" with Father and "hit his arm."

Mother further acknowledged that G. sustained injuries while in her care on December 11, 2015. Mother said that, at that time, she was unemployed, pregnant, and caring for G. "away from friends, family, [or] support," while living in subsidized housing in West Baltimore. Mother claimed that she had asked one of her roommates to watch G. while she was taking a shower. Mother said that she "heard [her] son screaming" and found him on the floor, between a bed and a wall. Mother acknowledged that "[w]hat happened to [G.] was absolutely horrible." Mother admitted that she did not "get[] him proper care immediately when [she] should have[.]" Mother said that she had "paid a big price" and "learned from that mistake." Mother described herself as reaching "rock bottom" when G. was removed from her care.

The program director of Chrysalis House testified on Mother's behalf. The program director described Chrysalis House as a "diagnostic and transitional program" for pregnant women and women with young children. The program director reported that Mother had not been a "disciplinary problem" while she was staying at Chrysalis House

10

for longer than a year while serving probation for her neglect conviction. The program director explained that she works with the women in the program daily "to make sure that they have bonded well with their newborns, that they are nurturing them properly and that they are abiding by the rules of the program." Based on her observations, the program director opined that Mother is "an excellent mom" to the parties' daughter.

Mother described her year-long stay at Chrysalis House as an experience that helped her "work through and overcome" issues with "anxiety" and "self-esteem problems." Mother said that, although "nothing about [her] decision was easy," she decided to return to her home town in California in March 2017 after the end of her probation. Mother said that she felt that she "needed to be closer to [her] family where they could properly help [her] and support [her] and get [her] life back in order." Mother believed that she had "turned [her] life around" because, for more than two years, she had been raising the parties' daughter "without issue."

At the time of trial, Mother was living in a three-bedroom townhouse in West Sacramento, California, along with her husband, her husband's four-year-old son, her two-year-old daughter, and their newborn daughter. Mother characterized her husband as "a very nurturing father" who had developed a close bond with her daughters. Mother explained that her most recent pregnancy was a "high risk pregnancy" involving "numerous hospitalizations." Mother said that, after she experienced complications, she and her husband decided that she should stop working in the restaurant business and "become a permanent stay-at-home mother." Mother said that she was "in the process of getting [a] certification as a medical coder through the American Health Information

Management Association[.]" Mother anticipated that she would take a final examination to become certified by May 2019, and then she would search for "a work-at-home position." Mother said that she did not know her husband's income, but she believed that her husband had the ability to support their family with his earnings as the manager of a restaurant near their home.[8]

At both the beginning and end of the trial, Father called attention to the court's obligations under Md. Code (1984, 2019 Repl. Vol.), § 9-101 of the Family Law Article ("FL"). That statute provides that, "if the court has reasonable grounds to believe that a child has been abused or neglected by a party" to a custody or visitation proceeding, the court must determine "whether abuse or neglect is likely to occur if custody or visitation rights are granted to the party." FL § 9-101(a). Unless the court makes a specific finding that "there is no likelihood of further child abuse or neglect by the party[,]" the court must deny the party's request for custody or unsupervised visitation. FL § 9-101(b).

Father argued that, given Mother's conviction for neglect of G., the court should grant her nothing more than supervised visitation. Father also argued that, even if Mother could demonstrate that there was no likelihood of further child abuse or neglect, G.'s best interests would be served by continuing the present arrangement, in which G. was living primarily with Grandfather in New York.

For her part, Mother argued that her life circumstances in 2019 were much different from those at the time of her criminal conduct in 2015. Mother emphasized that

---

[8] Mother's husband was present at trial, but he did not testify.

she and her husband were already raising three young children (including one biological child of Father) in their home. Mother also expressed her concern that, even though Father already had been granted custody of G., Father had been relying on Grandfather to raise G. in another state.

### F.     Custody Determination by the Circuit Court

Two weeks after the trial, the circuit court issued a comprehensive written opinion explaining its decision to grant Mother's request for custody of G.

The court began by explaining its rationale for the interim custody order from April 2018, in which the court had provided Mother only a few opportunities for visitation. The court explained:

> The purpose of the interim order was to temporarily preserve the status quo and to establish a baseline for future custody and visitation arrangements. It was based on limited testimony and was not a determination regarding the final merits of custody and visitation. The Court granted Father sole legal custody and primary physical custody because [G.] had ostensibly been in his custody for an extended period of time. The nature of the visitation arrangements, *i.e.*, meeting in a public place, was not based on any assessment of Mother's fitness as a parent. The goal was to minimize any volatility among the people involved by having them meet in a public place because of the palpable level of acrimony between the parties.

Next, the court made specific findings under FL § 9-101. The court found that there were "reasonable grounds to believe that [G.] had been neglected by Mother." The court made that finding based on "the criminal and child protective services proceedings related to Mother and [G.]" as well as the "evidence and testimony presented at the hearing." The court "specifically f[ound], however, that there is no likelihood of further child abuse or neglect by Mother." The court concluded, therefore, that FL § 9-101 did

13

not preclude an award of custody or visitation to Mother.

The court explained its determination as follows:

> Mother has learned some difficult lessons in life. These lessons have cost her not only financially, but have cost her by delaying her ability to form a relationship with [G.]. She testified candidly and credibly regarding the impact the criminal and child protective services proceedings had on her and the motivation those and other events provide to ensure that her past conduct does not dictate her future ability to be a fit parent.

> . . . Mother's life in general is on a better trajectory than it was soon after [G.]'s birth. At that time, she was emerging from a volatile relationship, was unemployed, had been incarcerated, and was living in transitional housing. Now, she is a married stay-at-home mom working towards a professional certification and is raising two of her children and her husband's child from a prior relationship. She lives in a townhome with her husband and their children. Her testimony demonstrates that she has an appropriate routine with the children and that she and her husband have the means to support themselves and their children. There was no evidence presented regarding any current issues with her parenting ability. There is no evidence to suggest that Mother would intentionally harm [G.].

Turning to the ultimate decision, the court commented: "This is a particularly difficult case because of the dynamics of the relationship between the parties, the figurative distance between their respective positions, and the geographical distance between their respective residences." The court made clear that Father and Mother, as the only two parties to the case, were the only "two choices for custody of [G.]." The court explained: "Despite [Grandfather's] role in [G.'s] upbringing, [Grandfather] is not a party because he has not filed a motion to intervene or otherwise become a party." Accordingly, the court analyzed the factors that are relevant to custody disputes between

14

two natural parents.[9]

Given the distance between Father's Maryland residence and Mother's California residence, the court concluded that one parent should have primary physical custody. The court concluded that joint legal custody would be inappropriate, because "Father and Mother have consistently demonstrated that they do not have the capacity to communicate and reach shared decisions affecting [G.]'s welfare." The court observed: "Their interactions are virtually non-existent because Father 'blocked' Mother from contacting him on his phone and insists that she communicate with [Grandfather] regarding [G.]"

The court determined that many of the relevant custody factors did not weigh in favor of either parent. The court found that both parents had the ability to meet G.'s needs in their respective homes. The court recognized that Mother's self-reported "mental health issues" and her "criminal convictions . . . cannot be overlooked." In assessing Father's character, however, the court credited Mother's testimony that "Father was controlling and abusive when they were in a relationship."[10] The court noted that both parents had made decisions which caused them not to be "actively engaged" in G.'s life "for extended periods of time." The court concluded that Mother's limited contact

---

[9] *See, e.g.*, *Azizova v. Suleymanov*, 243 Md. App. 340, 345-46 (2019) (discussing *Montgomery Cty. Dep't of Soc. Servs. v. Sanders*, 38 Md. App. 406 (1977), and *Taylor v. Taylor*, 306 Md. 290 (1986)), *cert. denied*, ___ Md. ___ (Mar. 11, 2020).

[10] The court did not use the term "abusive" here to refer to acts of physical abuse. The main example given by the court was Mother's testimony that she "was forced to live in Father's car" while she was pregnant with G.

15

with G. resulted, at first, from her own conduct, but that, more recently, Father and his family had taken actions "to prevent [G.] from establishing a meaningful relationship with Mother."  The court recognized that, although "Father ha[d] spent substantially more time with [G.] since his birth," Father had decided to "limit[] his visitation with [G.] to one or two trips . . . each month" throughout the previous year.

The court's ultimate decision turned on the contrast between the family living arrangements that the two parents had established since 2017.  The court found that Mother had shown that she was able and willing to raise G. in the home where she and her husband were already raising three young children.  The court found that, although Father appeared to be able to raise G. in his Maryland home, Father had demonstrated his preference that G. live primarily with Grandfather in New York.

Assessing the relative fitness of the parents, the court wrote:

> Both parties have issues regarding their fitness to be parents.  A few years ago, Mother's fitness to be a parent was questionable.  She was convicted of child neglect regarding [G.] and was the subject of adverse findings by a child protective services agency, although the conduct does not reflect an intent to harm [G.].  These are serious issues, but they do not forever preclude her from being considered a fit parent.  She was candid in her testimony regarding her mental health and other challenges she has faced in her life and how she overcame those challenges with the assistance of Chrysalis House, family and other resources.  She also clearly articulated the life lessons she has learned and her genuine commitment to be a fit parent.  Mother has made substantial progress and is currently doing well in California.  She is raising [G.]'s two-year-old sister . . . and [G.]'s newborn half-sister . . .  without any issues.  She also assists her husband in raising his four-year-old son . . . .  Father has demonstrated a baseline level of parental fitness.  His parenting solution, however, is to delegate his parenting authority to his parents . . . in New York, while seeing [G.] once or twice a month.  That is not real parenting.  With respect to fitness, Mother has overcome challenges and demonstrated that she is capable of being a fit parent.  Father has not demonstrated an ability to be a fit parent

16

without relying on his parents to effectively raise [G.]. Consideration of this factor supports granting custody to Mother.[11]

The court deemed Mother's request for custody to be "more genuine and sincere" than Father's request. The court was persuaded that Mother "genuinely wants to reunite with [G.] and to develop a meaningful relationship with him[,]" and "wants him to live with her and be a part of her family." The court concluded that Father's request was "not as genuine" as Mother's request, largely because Father had chosen to "delegate[] his parenting responsibility to his parents[.]" In the court's assessment, Father was "nominally seeking custody with the intent to continue to delegate" the task of raising G. to Father's parents. The court concluded that Father's decision to delegate his parental responsibilities, in combination with his "unwilling[ness] to take meaningful steps to foster a meaningful relationship between [G.] and Mother[,]" worked "to the detriment of [G.]'s relationship with his Mother and his siblings."

The court concluded that, "[a]lthough Father may have the financial means to maintain a stable and appropriate home for [G.], [Father] ha[d] not demonstrated a genuine interest in maintaining a home with [G.]." The court noted that Father had no children living in his household, aside from occasional visits with G. and with his other son from another relationship. The court also noted that Mother had demonstrated her "desire and ability to care for [G.] if he lived with her" because she already lived with three young children in her household. The court did not doubt Father's assertions that

---

[11] Citing this passage, Mother asserts that the circuit court found that Father was an unfit parent. Her interpretation is plainly incorrect.

"it is challenging to find reliable day care because of his alternating-shift schedule as a police officer." Nonetheless, the court reasoned that, "[r]egardless of whether his limited visitation with [G.] [wa]s related to his schedule or a lack of desire to spend more time with [G.], Father ha[d] demonstrated that he does not avail himself of opportunities to visit with [G.] frequently."

Overall, the court concluded that Mother was "ready, willing and able to provide a safe, comfortable and loving home for [G.]" The court concluded that it was in G.'s best interest to live with Mother during the school year and to have visitation with Father during school breaks and regular access to Father through a video chat service. The court noted that, if Father exercised his visitation rights under this schedule, his in-person contact with G. would actually increase, relative to the arrangement in which G. was living primarily with grandparents in New York.

The court awarded sole legal custody and primary physical custody of G. to Mother. The court granted Father visitation with G. on winter breaks from school in odd-numbered years, on spring breaks in even-numbered years, and for up to six weeks during the summer each year. The court required Mother to provide Father with access to G. through FaceTime or a comparable video chat service for up to 15 minutes, four times per week, and on certain holidays. The court directed that the exchange of custody should occur at Baltimore/Washington Thurgood Marshall International Airport and authorized law enforcement personnel to use reasonable and necessary force to return G. to Mother.

### G. Father's Post-Judgment Challenges to the Custody Determination

The court entered the order regarding custody and visitation on February 6, 2019.

18

Two days after the entry of judgment, Father filed a notice of appeal and a motion asking the circuit court to stay the custody order pending the outcome of the appeal.

In his motion to stay, Father asserted that, although the circuit court had made specific findings under FL § 9-101, the court's opinion included no discussion of a related statue, FL § 9-101.1, which concerns acts of abuse including abuse by one parent against another. That statute requires the court to "consider . . . evidence of abuse by a party against . . . the other parent of the party's child" when the court decides custody or visitation cases. FL § 9-101.1(b)(1). It provides: "If the court finds that a party has committed abuse against the other parent of the party's child . . ., the court shall make arrangements for custody or visitation that best protect: (1) the child who is the subject of the proceeding; and (2) the victim of the abuse." FL § 9-101.1(c). Father argued that, given the "undisputed evidence" that Mother had been found guilty of assaulting Father, the court erred by "fail[ing] to consider" FL § 9-101.1 in its custody determination.

On February 15, 2019, the circuit court denied Father's motion to stay the final custody order. The court rejected Father's assertions that the lack of a "specific reference" to FL § 9-101.1 meant that the court had failed to consider that issue. The court said that it had "considered the evidence regarding abuse, the parties' history of interactions and the dynamics of the parties' relationship." The court said that its "consideration of the allegations of abuse between the parties was subsumed in the consideration of the relevant factors to determine custody and visitation." The court reasoned that the "geographical distance between the parties" would "minimize[] the extent of personal interaction between the parties and should reduce conflict between the

19

parties." The court concluded that the custody and visitation arrangements established in the order would "minimize conflict and dispute to provide the protection contemplated by [FL § 9-101.1]."[12]

After the court declined to stay its custody order, Father made a timely motion to alter or amend the judgment.[13] Father continued to assert that the court had "failed to consider" FL § 9-101.1. In response, Mother pointed out that the court had already "clarified [its] ruling" regarding FL § 9-101.1 in the order denying Father's motion for a stay.

The circuit court denied Father's motion to alter or amend the custody order. The court concluded that "it [was] permitted to rule on the pending motion to alter or amend notwithstanding [Father's] appeal to the Court of Special Appeals." The court said that it had considered the merits of Father's motion and determined that "[t]here is no legal or factual basis to alter, amend or reconsider the . . . order regarding custody and visitation."

Father moved for reconsideration of the order denying his motion to alter or amend the custody order. Among other things, he reiterated his assertion that the court "failed to properly analyze" FL § 9-101.1. The court denied that motion.[14]

---

[12] Father also filed a motion asking this Court to stay the custody order pending his appeal. This Court denied that motion on February 15, 2019.

[13] The period for filing the motion to alter or amend the judgment ran until February 19, 2019, which was the Tuesday after the Presidents' Day holiday. *See Warehime v. Dell*, 124 Md. App. 31, 40-41 (1998) (applying Md. Rule 1-203(a)).

[14] During the pendency of this appeal, Father moved for a modification of custody, and Mother opposed his motion. The motion remains pending in the circuit court.

## DISCUSSION

In this appeal, Father asks this Court to reverse or vacate the order granting sole legal custody and primary physical custody of G. to Mother.

As Father observes in his brief, appellate courts apply different standards when reviewing different aspects of a custody or visitation decision. The appellate court will not set aside the trial court's factual findings unless those findings are clearly erroneous. *See, e.g.*, *Burak v. Burak*, 455 Md. 564, 616-17 (2017). To the extent that a custody decision involves a legal question, such as the interpretation of a statute, the appellate court must determine whether the trial court's conclusions are legally correct, and, if not, whether the error was harmless. *See id.* at 617. The trial court's ultimate decision will not be disturbed unless the trial court abused its discretion. *See id.*

Father's appellate brief presents the following two questions:

1. Whether the trial court committed legal error when it failed to consider [FL § 9-101.1] when granting [Mother] sole physical and legal custody of the minor child.

2. Even if the court was not required to consider [FL § 9-101.1], whether the trial court abused its discretion when it granted [Mother] sole physical custody of the minor child based upon the best interests of the child standard.

In response to the first question, we reject Father's assertion that the trial court failed to meet its obligations under FL § 9-101.1 to consider the evidence of Mother's prior abuse of Father and to make appropriate protective arrangements. In response to the second question, we conclude that the ultimate custody decision was not based on any error or abuse of discretion. The judgment will be affirmed.

21

# I.	Evidence of Abuse by Mother Against Father

Father's first challenge concerns an issue that he first raised in his motion to stay the custody order and in his motion to alter or amend the final custody order.  Father again contends that the court erred by "fail[ing] to consider" FL § 9-101.1 when it granted Mother's request for custody.

Collectively, sections 9-101 and 9-101.1 of the Family Law Article concern custody and visitation determinations where there is evidence that a party previously committed certain acts of abuse or neglect.  FL § 9-101 provides:

> (a) In any custody or visitation proceeding, if the court has reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding, the court shall determine whether abuse or neglect is likely to occur if custody or visitation rights are granted to the party.

> (b) Unless the court specifically finds that there is no likelihood of further child abuse or neglect by the party, the court shall deny custody or visitation rights to that party, except that the court may approve a supervised visitation arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child.

In short, section 9-101 embodies a presumption "that a child's best interest is not served by placing the child in the custody of someone with a history" of child abuse or neglect.  *In re Adoption No. 12612 in Circuit Court for Montgomery Cty.*, 353 Md. 209, 238 (1999).  This statute "dictates that, if the court . . . has reasonable grounds to believe that a child . . . has been abused or neglected by a party to the proceeding, the court must determine whether abuse or neglect is likely to occur if custody or visitation rights are granted to . . . the party responsible for the abuse or neglect."  *Id.* at 234.  "Unless the court specifically finds that there is no likelihood of further [child] abuse or neglect by

22

that party, it must deny custody or visitation rights to that party except for a supervised visitation arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child." *Id.*

The Court of Appeals has explained that FL § 9-101 often "needs to be considered together" with FL § 9-101.1. *Id.* at 229. That section "deals not just with abuse [or neglect] by a party . . . against a child but also with abuse by that party directed against the other parent of the child or the party's current spouse." *Id.* at 236. According to the Court of Appeals, the "legislative history of § 9-101.1 indicates recognition by the Legislature of a deep concern over the effect on a child of being in the maelstrom of *any* domestic violence within the home, including the abuse of adults and other children, whether or not those victims are related to the child whose custody or visitation is at issue." *Id.* at 236-37. In the process of enacting FL § 9-101.1, the General Assembly considered "the adverse effects on children from abusive households generally, not only the psychological harm derived from witnessing violence directed against other household members, but also the greater likelihood, statistically demonstrated, that violence directed against others, including adults in the home, will eventually be directed against them as well[.]" *Id.* at 237.

As defined by FL § 9-101.1, the term "abuse" includes various crimes against the person, including "assault in any degree[.]" FL § 4-501(b)(1)(iii). The statute provides:

> (b) In a custody or visitation proceeding, the court shall consider, when deciding custody or visitation issues, evidence of abuse by a party against:
>
> > (1) the other parent of the party's child;
> > (2) the party's spouse; or

> (3) any child residing within the party's household, including a child other than the child who is the subject of the custody or visitation proceeding.
>
> (c) If the court finds that a party has committed abuse against the other parent of the party's child, the party's spouse, or any child residing within the party's household, the court shall make arrangements for custody or visitation that best protect:
>
>> (1) the child who is the subject of the proceeding; and
>> (2) the victim of the abuse.

FL § 9-101.1(b)-(c).

In *In re Adoption No. 12612 in Circuit Court for Montgomery County*, 353 Md. 209 (1999), the Court of Appeals set aside an award of custody to a parent who previously abused a child, where the trial court made no specific finding that there was no likelihood of further child abuse or neglect by that parent. *Id.* at 212. There, the trial court had awarded custody of a child to his mother, notwithstanding that the mother had been convicted of murdering another of her children six years earlier. *Id.* The trial court had concluded that the murder was the product of postpartum depression and stated that the mother "did not 'pose a threat of death or fatal abuse'" to the child. *Id.* at 227. The Court of Appeals concluded that, under those circumstances, FL § 9-101 required the court to "determine 'whether abuse or neglect [was] likely to occur if custody or visitation rights' were granted to [the mother], and, unless it specifically found that 'there [was] no likelihood of further child abuse or neglect' by her, to deny custody and unsupervised visitation." *Id.* at 239. The Court explained that FL § 9-101 requires the trial court to "make a specific finding" and "does not envision an appellate court assuming the required finding from other disparate statements by the trial judge." *Id.* at

24

239. The Court vacated the custody order and remanded the case for the trial court to make a specific determination of whether there was a likelihood of further child abuse or neglect by the mother. *Id.* at 239-40.

Here, the trial court's opinion leaves no doubt that the court took account of the requirements of FL § 9-101. After quoting that provision in its entirety, the court expressly found, "based on the criminal and child protective services proceedings related to Mother and [G.] and evidence and testimony presented at the hearing[,]" that there were "reasonable grounds to believe that [G.] ha[d] been neglected by Mother." The court "specifically f[ound], however, that there is no likelihood of further child abuse or neglect by Mother." The court concluded, therefore, that FL § 9-101 did not "preclude th[e] [c]ourt from awarding custody and visitation rights to Mother."

In addition to the evidence that Mother neglected G., the court had also received evidence that Mother abused Father within the meaning of FL § 9-101.1. Namely, the court had received evidence that Mother had been found guilty of assaulting Father in 2015. The court's opinion did not expressly discuss this evidence or the statute.

Generally, even where the trial court must issue a statement explaining the reasons for its decision, the court need not articulate every step of the judicial thought process in order to show that it has conducted the appropriate analysis. *See Viamonte v. Viamonte*, 131 Md. App. 151, 162 (2000); *Bangs v. Bangs*, 59 Md. App. 350, 370 (1984). Certain statements from the trial court's opinion indicate that, at a minimum, the court was aware of Mother's conduct of assaulting Father in August 2015. Most notably, the court said that "Mother has experienced and overcome a variety of challenges, including mental

25

health issues and *criminal convictions*." (Emphasis added.) The court said that the "volatile relationship" between Father and Mother "seem[ed] to have brought out the worst in both of them." The court explained that its interim custody order required Mother's visits with G. to occur "in a public place," with the goal of "minimiz[ing] any volatility among the people involved[,]" in light of "the palpable level of acrimony between the parties."

Father faults the court for failing to mention FL § 9-101.1 in its opinion and failing to discuss the evidence of Mother's assault against Father. Father contends that the court, faced with "undisputed evidence" that Mother assaulted Father in August 2015, had an obligation to "make and articulate specific findings" under FL § 9-101.1.

In support of his argument, Father attempts to liken the present case to *In re Adoption No. 12612 in Circuit Court for Montgomery County*, 353 Md. 209 (1999). We find that comparison to be inapt. Here, the trial court made the findings that are expressly required by FL § 9-101, when it found that it had reasonable grounds to believe that Mother had neglected G. but specifically found no likelihood that Mother would commit further child abuse or neglect. Moreover, the court fully articulated the rationale for its conclusion that there was no likelihood of further child abuse or neglect by Mother.

The *In re Adoption No. 12612* opinion includes some discussion of FL § 9-101.1, but the opinion does not address whether trial courts must make specific findings under FL § 9-101.1 whenever that statute is implicated. The language used to describe the court's obligations in FL § 9-101.1 is by no means identical to or equivalent to the language used in FL § 9-101. Section 9-101 states that the court "shall determine" the

26

likelihood of further child abuse or neglect and that the court "shall deny" custody or unsupervised visitation unless the court "specifically finds" no likelihood of further child abuse or neglect. By contrast, section 9-101.1 states that the court "shall consider" evidence of abuse by a party against the child's parent and that the court "shall make arrangements" to best protect the child and the victim of the abuse, "[i]f the court finds" that the party has committed abuse against the other parent.

In any event, even if the trial court was obligated to make specific findings under FL § 9-101.1, the record shows that the court has already made those findings. Immediately after the court entered its opinion and order regarding custody, Father argued that the court should stay its order because, in his words, the court had "failed to consider" FL § 9-101.1. In the order denying his motion, the court wrote:

> For the sake of clarity of the order regarding custody and visitation and for the record on appeal, the Court will address an issue Father raised regarding section 9-101.1 of the Family Law Article[.] . . .
>
> According to Father, the Court did not consider the provisions of this statute in the order regarding custody and visitation. That is not correct. By way of contrast, the Court specifically addressed section 9-101 of the Family Law Article . . . because that statute precludes a court from awarding custody to a party . . . unless the Court makes a specific finding regarding future neglect or abuse. . . . The lack of a specific reference to section 9-101.1 of the Family Law Article does not mean that the Court did not consider the provisions and purpose of that statute.
>
> The Court's consideration of the allegations of abuse between the parties was subsumed in the consideration of the relevant factors to determine custody and visitation. The Court considered the evidence regarding abuse, the parties' history of interactions and the dynamics of the parties' relationship. The geographical distance between the parties . . . minimizes the extent of personal interaction between the parties and should reduce conflict between the parties. Based on the Court's consideration the evidence and the factors to determine custody and visitation, the Court

27

otherwise made arrangements to minimize conflict and dispute to provide the protection contemplated by section 9-101.1 of the Family Law Article.[15]

Despite that ruling, Father reiterated his assertion that the trial court had "failed to consider" FL § 9-101.1 in his subsequent motion to alter or amend the judgment. In response, Mother correctly observed that the court had already "clarified [its] ruling" regarding FL § 9-101.1. The court denied his motion to alter or amend the custody order, stating that there was "no legal or factual basis" to do so.

We conclude that, under these circumstances, the trial court's failure to mention FL § 9-101.1 in its initial opinion is no basis for vacating the judgment. To the extent that the initial opinion might arguably have fallen short of fulfilling the court's responsibilities under FL § 9-101.1, the court addressed any deficiency, six days later, in the order denying Father's motion for a stay. In light of that order, we have no doubt that the court did, in fact, consider the evidence of Mother's abuse against Father and exercise its discretion regarding the appropriate protective arrangements. No practical purpose would be served by further proceedings for the court to restate what it has already said.

Father also argues that the trial court "abused its discretion" under FL § 9-101.1(c) "when it found that granting [Mother] sole legal and [primary] physical custody would best protect [G.] and Father[.]" This argument reflects a misunderstanding of the court's statutory obligation. FL § 9-101.1 "does not scrap the overall best interest of the child standard in favor of another single, alternative standard[.]" *In re Adoption No. 12612*,

---

[15] Father omitted the order denying his motion for stay from the record extract.

28

353 Md. at 238. Rather, it obligates the court, when it receives evidence of a party's history of violence against certain household members, "to give due consideration to such violence in determining what is in a child's best interest." *Id.* at 237. The court concluded that, whether G. lived with Father or with Mother, additional protective arrangements were unnecessary because this outcome would maintain minimal in-person interactions between the two parents. We see nothing unreasonable about this exercise of discretion.

## II.    Decision to Grant Mother's Claim for Custody

Father's second challenge concerns the merits of the trial court's ultimate custody decision. Generally, orders concerning custody and visitation are "within the sound discretion of the trial court, not to be disturbed unless there has been a clear abuse of discretion." *Barrett v. Ayres*, 186 Md. App. 1, 10 (2009).

"Child custody and visitation decisions are among the most serious and complex decisions a court must make, with grave implications for all parties." *Conover v. Conover*, 450 Md. 51, 54 (2016). The court's primary objective, when deciding disputes over child access, "is to serve the best interests of the child." *Id.* at 60. Assessing the child's best interests requires the court "'to evaluate the child's life chances in each of the homes competing for custody and then to predict with whom the child will be better off in the future.'" *Domingues v. Johnson*, 323 Md. 486, 499 (1991) (quoting *Montgomery Cty. Dep't of Soc. Servs. v. Sanders*, 38 Md. App. 406, 419 (1977)).

This Court has "observed that 'there is no such thing as a simple custody case,' and that 'a judge agonizes more about reaching the right result in a contested custody

issue than about any other type of decision.'" *Bienenfeld v. Bennett-White*, 91 Md. App. 488, 502-03 (1992) (quoting *Montgomery Cty. Dep't of Soc. Servs. v. Sanders*, 38 Md. App. at 414). Given the "unique character of each case" and "the subjective nature of the evaluations and decisions that must be made," the courts have identified the "major factors that should be considered" in custody cases, while recognizing that "no single list of criteria will satisfy the demands of every case." *Taylor v. Taylor*, 306 Md. 290, 303 (1986). In many cases, the evidence and factors "would support the ultimate decision made by the trial judge" and "would also support a contrary decision" to award custody to the other parent. *Goldmeier v. Lepselter*, 89 Md. App. 301, 313 (1991); *accord Domingues v. Johnson*, 323 Md. at 492. "'At the bottom line, what is in the child's best interest equals the fact finder's best guess.'" *Bienenfeld v. Bennett-White*, 91 Md. App. at 503 (quoting *Montgomery Cty. Dep't of Soc. Servs. v. Sanders*, 38 Md. App. at 419).

Accordingly, trial courts are entrusted with "great discretion in making decisions concerning the best interest of the child." *Petrini v. Petrini*, 336 Md. 453, 469 (1994). The "appellate court does not make its own determination as to a child's best interest; the trial court's decision governs, unless the factual findings made by the [trial] court are clearly erroneous or there is a clear showing of an abuse of discretion." *Gordon v. Gordon*, 174 Md. App. 583, 637-38 (2007).

The clearly-erroneous standard is "a deferential one, giving great weight" to the trial court's findings. *Viamonte v. Viamonte*, 131 Md. App. 151, 157 (2000). When scrutinizing factual findings, this Court must "give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8-131(c). Generally, a

30

"trial court's findings are 'not clearly erroneous if there is competent or material evidence in the record to support the court's conclusion.'" *Azizova v. Suleymanov*, 243 Md. App. 340, 372 (2019) (quoting *Lemley v. Lemley*, 109 Md. App. 620, 628 (1996)), *cert. denied*, ___ Md. ___ (Mar. 11, 2020).

"On the ultimate issue of which party gets custody . . . we will set aside a judgment only on a clear showing that the [trial court] abused [its] discretion." *Viamonte v. Viamonte*, 131 Md. App. at 157 (citing *Davis v. Davis*, 280 Md. 119, 125 (1977)). Appellate courts "rarely, if ever, actually find a reversible abuse of discretion on this issue." *McCarty v. McCarty*, 147 Md. App. 268, 273 (2002). An abuse of discretion may occur when no reasonable person would take the view adopted by the trial court, or when the court acts without reference to any guiding rules or principles, or when the ruling is clearly against the logic and effect of facts and inferences before the court. *See, e.g.*, *Santo v. Santo*, 448 Md. 620, 625-26 (2016). This standard "accounts for the trial court's unique 'opportunity to observe the demeanor and the credibility of the parties and the witnesses.'" *Id.* at 625 (quoting *Petrini v. Petrini*, 336 Md. at 470). The trial judge who "'sees the witnesses and the parties, [and] hears the testimony . . . is in a far better position than the appellate court, which has only a [transcript] before it, to weigh the evidence and determine what disposition will best promote the welfare of the [child].'" *Viamonte v. Viamonte*, 131 Md. App. at 157 (quoting *Davis v. Davis*, 280 Md. at 125). Because "appellate review is properly limited in scope, the burden of making an appropriate decision necessarily rests heavily upon the shoulders of the trial judge." *Taylor v. Taylor*, 306 Md. at 311 (citation omitted). Indeed, custody decisions are

31

"unlikely to be overturned on appeal." *Domingues v. Johnson*, 323 Md. at 492.

In this appeal, Father disputes the trial court's finding pursuant to FL § 9-101 that there was no likelihood of future abuse and neglect by Mother. As the parent found to have previously neglected her child, Mother had the burden to produce evidence to persuade the court that there was no likelihood that she would commit further child abuse or neglect. *See In re Yve S.*, 373 Md. 551, 587 (2003).

FL § 9-101 "does not absolutely preclude a parent who has previously abused or neglected his or her child from ever having custody or visitation." *In re Adoption No. 12612 in Circuit Court for Montgomery Cty.*, 353 Md. 209, 238 (1999). This statute "merely requires the court, when faced with a history of child abuse or neglect by a party seeking custody or visitation, to give specific attention to the safety and well-being of the child in determining where the child's best interest lies and not place the child in harm's way." *Id.* The statute "does not set an insurmountable burden; even upon substantial evidence of past abuse or neglect, it does not require a finding that further abuse or neglect is impossible or will, in fact, never occur, but only that there is no likelihood—no probability—of its recurrence." *Id.* In other words, the statute "does not require that the hearing judge be a prophet or soothsayer and somehow 'know' that there will never be a future incident of abuse or neglect." *In re Yve S.*, 373 Md. at 587-88. "Such a finding would require unobtainable proof on the part of the parent, and omniscience on the part of the judge." *Id.* at 588.

Father argues that "the evidence was quite clear that [Mother] had done absolutely nothing during [G.'s] entire life that would give any reasonable person the belief" that

she could care for G. without further child abuse or neglect. In making this very argument, however, Father provides (at pages 18 through 25 of his opening brief) a thorough account of much of the evidence that the court used to assess the likelihood of further child abuse or neglect by Mother.

As the court summarized, the evidence established that, at the time that Mother neglected G. in December 2015, "she was emerging from a volatile relationship, was unemployed, had been incarcerated, and was living in transitional housing." The court credited Mother's testimony that, after that instance of neglect, Mother worked to "overc[o]me" her "mental health challenges" and other challenges "with the assistance of Chrysalis House, family[,] and other resources." At the time of trial in January 2019, her commitment to raising her children was not simply aspirational; she and her husband were raising three young children (including G.'s sibling and one child the same age as G.). As the court noted, there was "no evidence presented regarding any current issues with her parenting ability." The court correctly understood that its task was to assess the child's best interest as of the time of the custody trial. *See Azizova v. Suleymanov*, 243 Md. App. at 357. The court's evaluation of Mother's past conduct was "only relevant insofar as it [may be] predictive of future behavior and its effect on the child." *Id.*

Father insists that Mother's own testimony regarding her fitness as a parent to three children "lack[s] any modicum of reliability." In addition, Father disputes the court's conclusion that Mother did not intend to harm G. in December 2015, arguing that Mother's account of how G. sustained injuries "lacks credibility." It is not our role, as an appellate court, to second-guess the trial judge's assessment of a witness's credibility.

33

*See, e.g.*, *Michael Gerald D. v. Roseann B.*, 220 Md. App. 669, 687 (2014).

Father also suggests that Mother needed to produce additional evidence to corroborate her testimony that she had made progress with her self-reported mental health challenges. Father asserts that "there was no evidence from an expert or otherwise that would have properly established that [Mother] had overcome the abundance of issues she had experienced with [G.] during a very short period of time." Father notes that Mother "did not take the domestic violence classes [that] she was ordered to take" as a condition of her probation and that she "had not taken any parenting classes." Father fails to mention, however, that Mother spent over a year in Chrysalis House under the supervision of professionals (like the program director who testified on Mother's behalf) who counseled Mother and worked with her to ensure that she was giving proper care to the parties' daughter.

Mother was not required to meet some heightened evidentiary threshold before the court could reasonably find that there was no likelihood of that she would commit further child abuse or neglect. *See In re Yve S.*, 373 Md. at 588 (noting that the court's finding "there is no likelihood abuse or neglect is likely to reoccur" should be made "by a preponderance of the evidence"). General concerns about Mother's mental health history by no means precluded the court from finding that further abuse or neglect by Mother was unlikely. *See id.* at 593-94. Despite Father's insistence that Mother's "mistakes and issues were not in her past," we see nothing unreasonable in the court's conclusion that Mother had sufficiently demonstrated her fitness as a parent during the three years that followed her conviction for neglect. Overall, the court made a reasonable conclusion

34

that, given the dramatic changes in Mother's life, the circumstances under which she previously committed neglect were unlikely to be repeated.

In addition to disputing the court's specific findings under FL § 9-101(b), Father contends that the trial court "failed to properly weigh the evidence presented at trial" when the court assessed G.'s best interests.

Among Father's challenges to the court's evaluation of the custody factors, the most significant is his assertion that Mother "voluntarily abandoned" G. when she moved to California in March 2017. Abandonment is a most serious allegation. *See, e.g.*, *Burak v. Burak*, 455 Md. 564, 648 (2017) (explaining that a finding that a parent has abandoned a child may permit a non-parent to overcome the presumption that a child's best interest is served by being placed in the custody of the parent). In a related context, the Court of Appeals has "defined child abandonment as: 'Any wilful and intentional conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child, and to renounce and forsake the child entirely.'" *Wakefield v. Little Light*, 276 Md. 333, 351 (1975) (quoting *Logan v. Coup*, 238 Md. 253, 258 (1965)).

The trial court credited Mother's testimony that she moved to California "with the goal of getting her life back on track for the benefit of her children." The court concluded that Mother was still "actively seeking to establish a relationship with [G.]" even though Father and his family were attempting "to prevent [G.] from establishing a meaningful relationship with Mother." Notably, when Mother relocated, she did not withdraw her claim for custody of G., but she continued to litigate it and eventually

35

gained visitation and access rights through the court's interim order in April 2018. We see no error in the court's finding that Mother did not "voluntarily abandon[]" her son by moving across the country while continuing to pursue access and custody through the courts. "At no time could her actions be construed to evince a settled purpose to relinquish all parental claims to [G.]." *Id.* at 351-52.

Father further contends that the court should have found that the parties had made "an agreement" that G. "would stay in the care and custody of [Father] when [Mother] moved back to California." Father cites no evidentiary support for this particular argument. Although the testimony indicated that both parties understood in March 2017 that G. would not be joining Mother in California, this evidence did not compel any conclusion that the two of them ever reached any formal or informal agreement regarding custody. The court did not err when it found that there were "no agreements between the parties regarding custody or visitation issues."

More generally, Father recounts other evidence that, he argues, demonstrates Mother's unfitness, such as: her failure to complete domestic violence classes as a condition of her probation, her pattern of making false accusations against Father, her sporadic work history, her lack of financial support for G., her reliance on her husband's income, her decision to enroll her children in daycare, and certain unflattering statements she published on social media. Father argues that the court should have concluded that he was the more fit parent, that his request for custody was more sincere, that he had established a stronger relationship with G., that he was better able to maintain G.'s relationships with family members, that his financial status was superior, and that moving

36

to California would unduly disrupt G.'s social and school life in New York. Collectively, these arguments show, at most, that a fact-finder might have reached different conclusions from the evidence or might have assessed the custody factors differently. These arguments fail to show that any of the trial court's findings were unsupported by sufficient evidence or that the court's reasoning was irrational.

As Mother aptly notes, Father's argument depends upon characterizing the evidence and inferences drawn from the evidence "in the light most favorable to [Father]," without any deference to the court's findings. Moreover, Father's arguments fail to directly address the crux of the trial court's rationale. The trial court's opinion reveals that the court appreciated that both parents were suitable, but imperfect, options, but the court believed that G.'s best interest would be served by living with the parent who had better demonstrated a commitment to raising G. in the parent's home. The court's assessment may "seem harsh to a loving [father]," but it was not an abuse of discretion. *Viamonte v. Viamonte*, 131 Md. App. at 162.

Overall, we are not persuaded that the trial court's findings were clearly erroneous or that the court otherwise abused its discretion in making its custody determination. The selection of a custodial parent who would serve the child's best interests "was neither easy nor clearcut" here, but it was one "for [the trial judge] to make in the exercise of his discretion." *Bienenfeld v. Bennett-White*, 91 Md. App. at 502-03.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

37

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/3236s18cn.pdf